In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2185

DIANNA R. ELDER,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE, Commissioner
of Social Security,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 05 C 651—**Allen Sharp**, *Judge.*

———————

ARGUED APRIL 4, 2008—DECIDED JUNE 16, 2008

———————

Before POSNER, KANNE, and ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge*. Dianna Elder applied for Disability Insurance Benefits and Supplemental Security Income (SSI), claiming that her fibromyalgia rendered her disabled as that term is defined by the Social Security Act ("the Act"), 42 U.S.C. § 301 *et seq.* The administrative law judge (ALJ) denied Elder's claims in November 2004. After the Social Security Appeals Council ("Appeals Council") declined Elder's request for review, the district court affirmed the ALJ's decision. Elder now argues that the ALJ's decision was wrong; in Elder's view, the ALJ errone-

ously concluded that her descriptions of the severity her ailments were not credible, and improperly evaluated the medical opinions of two of her treating physicians. We affirm.

## I. HISTORY

Elder filed an application for disability and SSI claims in November 1999, alleging that her fibromyalgia and depression rendered her disabled as of August 12, 1998. As Elder explained in her application, she was 34 years old on her claimed onset date, had a high school education, and had worked at a factory operated by Eaton Corporation as a mold operator and bench assembler. She also stated that she was five feet, eleven inches tall (a measurement that, for some reason, changes throughout the record), and weighed 316 pounds; however, as her attorney repeatedly stated at oral argument, Elder based her claims on the severity of her fibromyalgia and depression, and not on her obesity.

Elder's claims of disability originated in August 1998, when she sought treatment from her family doctor, Dr. James Hanus, for pain in her arms and legs. Aware that Elder had complained of similar pain in the past, Dr. Hanus provided a preliminary diagnosis of fibromyalgia. He then referred Elder to Dr. Steven Ko, a rheumatologist, to confirm his assessment and to provide treatment for her pain.

Dr. Ko diagnosed Elder with fibromyalgia when he first treated her in September 1998. When Dr. Ko inquired about the severity of her condition, Elder explained that, because of the pain, she had difficulty walking, climbing stairs, sitting, and accomplishing everyday activities,

such as cooking, washing dishes, and doing laundry. Elder also stated, however, that she was able to maneuver up and down the stairs at her home, and that she did most of the housework and shopping for her family. In all, Elder stated that her ability to function was a 3 on a scale of 1 to 5, which, Dr. Ko stated, was "okay." Dr. Ko prescribed to Elder pain medication, and instructed her to exercise regularly.

Elder visited Dr. Ko eight times over the following year, and during this time she provided mixed reports regarding the severity of her condition. On occasion, Elder reported to Dr. Ko that her fibromyalgia had gotten much worse; at other times, she stated that her pain had subsided. And although Elder's descriptions of her pain fluctuated, she regularly told Dr. Ko that she was following his instructions to exercise. For instance, in November 1998, Elder informed Dr. Ko that she had participated in an aquatic-exercise class, but stopped attending for a while after "overdo[ing] it one day." However, she also stated that she "[went] out three times a week for approximately twenty minutes at a time" without any problem, and that she was able to walk about "one-and-a half miles." At an appointment in January 1999, Elder reported that she had returned to the aquatic-exercise class, and had since been able to participate in the program three times a week without any pain. Likewise, in June 1999, Elder informed Dr. Ko that she was exercising on a stair-step machine at home three times a day for five to ten minutes each time.

In response to Elder's reports of her ability to exercise regularly, Dr. Ko opined at the June 1999 appointment that Elder could "probably go back to work on a part-time basis or at a reduced capacity." He therefore advised

Elder to obtain a functional capacity evaluation from a physical therapist so she could seek "an alternative vocation." But at Elder's final appointment with Dr. Ko in August 1999, she informed him that "she was not able to obtain the functional capacity evaluation for her work," and had not pursued any type of "vocational rehab." Elder did state, though, that she was still exercising—"walking almost a mile a day," and continuing to participate "in a water exercise program." Dr. Ko noted that he had done all that he could for Elder, including having encouraged her to "look into vocational rehab programs where she could look into alternative work." He thus concluded that there was no other treatment that he could provide to her, and discharged her from his care. Shortly thereafter, Elder returned to Dr. Hanus to discuss the status of her treatment and to review her medical records so she could prepare her disability and SSI application.

Elder filed her application, and while it was pending she underwent a consultative medical examination by Dr. Michael Holton. Elder did not complain to Dr. Holton about any debilitating pain; she instead informed him that she could "walk about 2-3 blocks level at a leisurely pace or up less than 1 flight of steps generally without increased discomfort or difficulty." Based on Elder's statements and his own examination, Dr. Holton determined that, although Elder had fibromyalgia, she had no difficulty walking, had normal muscle strength and tone, and could grip 25 pounds with both hands.

Also during this time, Elder continued to seek treatment from Dr. Hanus for various ailments, such as vertigo, sinus infections, and issues related to her diabetes mellitus. She also saw Dr. Hanus for, as she put it, "a recheck of her fibromyalgia," although Dr. Hanus's medical records from

this period show that he did nothing more than note Elder's complaints of pain, prescribe her different kinds of pain medication, and provide her with medical excuses from work. Nevertheless, Dr. Hanus sent a letter to the Social Security Commission, in which he stated that Elder had "one of the [worst] cases of fibromyalgia that [he had] ever seen," and further opined that she was disabled.

The ALJ held a hearing on Elder's claims in October 2001. Elder testified at the hearing that her fibromyalgia caused her pain "all over," and that the pain sapped her energy, caused her to be depressed, and prevented her from doing "anything." Shortly thereafter, the ALJ denied Elder's claim. However, Elder sought review from the Appeals Council, and in May 2003 the Appeals Council remanded her case to allow the ALJ the chance to obtain additional medical evidence both explaining how Elder's fibromyalgia contributed to her depression and specifying the nature and severity of Elder's ailments. The Appeals Council also stated that the new evidence could include additional consultative medical examinations.

On remand, the ALJ obliged the Appeals Council, and ordered Elder to undergo additional consultative medical examinations. Accordingly, Elder was examined by, among other doctors, Dr. Bhuependra Shah, who focused his examination on Elder's neurological health and muscle strength. As relevant here, Dr. Shah opined that Dr. Hanus's and Dr. Ko's medical records revealed that Elder's fibromyalgia was "unremarkable." Dr. Ko further stated that Elder's strength was normal, and that she could lift and carry 25 pounds occasionally and 20 pounds frequently. Dr. Hanus also submitted additional

information to supplement his earlier statements supporting Elder's disability claims. Specifically, Dr. Hanus stated that, because of her fibromyalgia, Elder could rarely lift more than 10 pounds and never could lift more than 20 pounds.

The ALJ held a second hearing on Elder's claims in March 2004, and at that hearing Elder provided a much more detailed description of the severity of her fibromyalgia than she did at her first hearing. She described that, on a good day, she could do the laundry and wash the dishes, but on days when her fibromyalgia "flared-up" the pain was so intense that the only thing that she could do was lie in bed and periodically walk to the restroom. But when Elder was confronted with Dr. Ko's medical records from November 1998, she denied having told him that she was able to walk a mile-and-a-half a day; as Elder put it, "[t]here was no possible way" that she could have walked that far. And although Elder admitted to having participated in some aquatic-aerobics classes, she stated that—contrary to what Dr. Ko recorded—she was unable to complete more than five to ten minutes of the classes because of her pain.

Shortly after the second hearing, the ALJ again denied Elder's claims. The ALJ reached its conclusion after he conducted the five-step sequential analysis required by 20 C.F.R. § 404.1520(a)(4)(i)-(v). Specifically, the ALJ found that Elder had not performed substantial gainful work since seeking treatment for her fibromyalgia and depression (Step One), and that although Elder's ailments were severe (Step Two), they did not meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4 of the Social Security regulations (Step Three).

Because the ALJ made no disability determination at Step Three, he proceeded to formulate Elder's residual functional capacity (RFC), which is, in layman's terms, her maximum work capability. *See id.* § 404.1520(e); *Butera v. Apfel*, 173 F.3d 1049, 1054 (7th Cir. 1999). As a part of his formulation, the ALJ first determined that Elder did not present credible testimony regarding the severity of her ailments. As the ALJ saw it, Elder offered only "self-serving testimony that she was not exercising as much or doing as much at home as Dr. Ko asserted in his treatment records." After all, the ALJ pointed out, Dr. Ko "repeatedly remarked" in his medical records that Elder informed him that she "was participating in water aerobics and walking a mile to a mile and one half per day," that "she did most of the housework and shopping," and that she was able to care for her family. The ALJ next determined that Dr. Ko's records did not support Elder's claim that she had "no capacity for work" because he repeatedly instructed her to "go to vocational rehabilitation to get help finding an alternate job that did not require as much physical exertion." The ALJ likewise declined to afford "substantial weight" to Dr. Hanus's opinion that Elder could not work because Dr. Hanus did not perform a "thorough" medical examination to corroborate Elder's descriptions of the severity of her fibromyalgia. Indeed, the ALJ continued, Dr. Hanus was merely a "family practitioner" and "not a specialist" in fibromyalgia, and, as such, was concerned with only Elder's general health and well-being. The ALJ then determined that Dr. Horton's and Dr. Shah's medical opinions supported a finding that Elder could, in fact, perform "a limited range" of light work. And looking to those opinions, the ALJ ascertained that Elder retained an RFC to lift or carry 20 pounds occasionally and

10 pounds frequently, to alternate sitting and standing throughout the day, and to walk up to one-and-one-half miles at a time.

The ALJ then determined that, given her RFC, Elder could not perform her past occupation as a mold operator and bench assembler (Step Four). But, the ALJ concluded, Elder's RFC did not prevent her from holding a job that required her to perform light work, such as a position as an office helper, cashier, or maid (Step Five). The ALJ therefore concluded that Elder was not disabled under the Act, and denied her claims for disability and SSI benefits.

Elder again sought review from the Appeals Council. But, unlike earlier, the Appeals Council denied review. Elder then appealed the ALJ's decision to the district court, *see Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005), which, in turn, determined that the ALJ's findings did not "run afoul of the decisions of the Court of Appeals in this circuit." The court accordingly entered judgment for the Commissioner.

## II. ANALYSIS

On appeal, Elder challenges only the ALJ's RFC formulation. Specifically, Elder contends that the ALJ committed two errors that led him to underrepresent the severity of her fibromyalgia and depression when determining her RFC. First, Elder asserts that the ALJ erroneously concluded that her testimony regarding the severity of her conditions was not credible. Second, Elder argues that the ALJ "improperly evaluated" the medical opinions of Dr. Ko and Dr. Hanus.

We review the district court's judgment *de novo*, *see Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007), meaning that we review the ALJ's decision directly, *see Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). However, in so doing, we apply a very deferential standard of review. *See id.*; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Specifically, we review the ALJ's decision to see if it is supported by "substantial evidence," 42 U.S.C. § 405(g); *see also Schmidt*, 496 F.3d at 841, meaning " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " *Skinner*, 478 F.3d at 841 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). As such, our role is extremely limited. We are not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations. *See Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). In fact, even if " 'reasonable minds could differ concerning whether [Elder] is disabled,' " we must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported. *Schmidt*, 496 F.3d at 842 (quoting *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996)).

### A. The ALJ's adverse credibility determination

Elder first challenges the ALJ's determination that her testimony regarding the severity of her fibromyalgia and depression was not credible. In so contesting, she makes a bevy of conflated arguments involving the ALJ's purported refusal to consider certain medical evidence that, she asserts, would have bolstered her credibility. However, Elder's points are misguided, if not irrelevant altogether. When assessing an ALJ's credibility determination, we do not, as Elder suggests, undertake a *de novo* review of the

medical evidence that was presented to the ALJ. Instead, we merely examine whether the ALJ's determination was reasoned and supported. *See Jens*, 347 F.3d at 213-14; *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). It is only when the ALJ's determination lacks any explanation or support that we will declare it to be " 'patently wrong,' " *Jens*, 347 F.3d at 213 (quoting *Powers*, 207 F.3d at 435), and deserving of reversal.

Elder's challenge is short-lived. The ALJ clearly provided a reason for his adverse credibility determination: he stated that Elder's testimony regarding the severity of her fibromyalgia and depression contradicted what she told Dr. Ko. The record supports this explanation. At her hearing, Elder described her inability to complete more than five to ten minutes of the aquatic-aerobics classes, and that "[t]here was no possible way" that she was able to walk a mile a day; she also stated that on days in which her fibromyalgia was at its worst, the most that she could do was lie in bed and occasionally walk to the restroom. And although Elder reported to Dr. Ko on several occasions that her fibromyalgia had worsened, she regularly informed him that, notwithstanding her pain, she was able to function and to exercise regularly—including participating in aquatic-exercise classes up to "three times a week" and regularly walking extended distances. It was well within the ALJ's authority to disregard Elder's testimony because it conflicted with what she told Dr. Ko. *See Powers*, 207 F.3d at 435 ("[T]he discrepancy between the minimal impairment expected from [claimant's] conditions and her testimony of debilitating pain casts doubt on her credibility."); *see also Brewer v. Chater*, 103 F.3d 1384, 1392 & n.11 (7th Cir. 1997) ("It is the responsibility of the ALJ, not of a reviewing court, to resolve conflicting evidence and

to make credibility determinations. . . . The ALJ's crediting of [claimant's] contemporaneous statements concerning her job duties and his discounting of her later statements at the hearing were proper."); *Limberopoulos v. Shalala*, 17 F.3d 975, 978-79 (7th Cir. 1994); *Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir. 1991). We thus cannot say that the ALJ was patently wrong in doing so.

### B.  *The ALJ's evaluation of Dr. Ko's and Dr. Hanus's medical opinions*

Elder also argues that the ALJ erred by inadequately reviewing Dr. Ko's medical opinions and by failing to afford Dr. Hanus's medical opinions "substantial weight." As to Dr. Ko's opinions, Elder contends that the ALJ did not consider specific statements that Dr. Ko made in his medical records that support a disability finding. Specifically, Elder asserts that Dr. Ko stated that she "could probably go back to work on a part-time basis at a reduced capacity." According to Elder, these statements proved that she could work on a part-time basis only, and thus was disabled. *See Bladow v. Apfel*, 205 F.3d 356, 359 (8th Cir. 2000) (explaining that, under Social Security Ruling 96-8p, ability to work only part-time mandates disability finding); *Kelley v. Apfel*, 185 F.3d 1211, 1214-15 (11th Cir. 1999) (same). Elder therefore argues that the ALJ erred by completely failing to evaluate this evidence of her disability.

However, Elder misconstrues Dr. Ko's statements and inflates their importance. Dr. Ko did not opine, as Elder puts it, that she "could probably go back to work on a part-time basis at a reduced capacity." Instead, Dr. Ko stated that Elder could go back to work *either* "on a part-time

basis" *or* "at a reduced capacity"—meaning that she *could* work on a full-time basis so long as she found a new job that required less exertion than her job at Eaton Corporation. Indeed, the fact that Dr. Ko regularly and repeatedly urged Elder to seek vocational rehabilitation for help with finding a less strenuous job reveals that he believed that she could work full-time. Simply put, the record does not support Elder's assertion that Dr. Ko opined that she could work only part-time.

Even more, the ALJ ultimately agreed with Dr. Ko's assessment that Elder could work full-time "at a reduced capacity." The ALJ stated that Dr. Ko's medical opinions did not support Elder's claim that she had "no capacity for work," and formulated an RFC that reflected that she could work full-time "at a reduced capacity." The ALJ even explicitly determined at Step Four that Elder could not go back to work at Eaton Corporation given her RFC, but could, nevertheless, perform "a limited range" of light work. Elder's argument that the ALJ ignored Dr. Ko's opinion is therefore meritless.

Equally meritless is Elder's argument that the ALJ failed to afford "substantial weight" to Dr. Hanus's medical opinions. Elder asserts that, after she was discharged from Dr. Ko's care, she saw Dr. Hanus for fibromyalgia-related pain "every two and-a-half months." And based on examinations performed during that period, Elder continues, Dr. Hanus concluded that she could rarely lift more than 10 pounds and could never lift more than 20 pounds—conclusions that the ALJ was wrong to discount.

The parties do not dispute that Dr. Hanus was Elder's treating physician. And a treating physician's opinion regarding the nature and severity of a medical condition

is entitled to controlling weight if it is (1) supported by medical findings; and (2) consistent with substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Skarbek*, 390 F.3d at 503. A decision to deny a physician's opinion controlling weight does not prevent the ALJ from considering it, however, and the ALJ may still look to the opinion after opting to afford it less evidentiary weight. Exactly how much weight the ALJ affords depends on a number of factors, such as the length, nature, and extent of the physician and claimant's treatment relationship, *see* 20 C.F.R. § 404.1527(d)(2)(I)-(ii), whether the physician supported his or her opinions with sufficient explanations, *see id.* § 404.1527(d)(3), and whether the physician specializes in the medical conditions at issue, *see id.* § 404.1527(d)(5). *See also Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ " 'minimally articulate[d]' " his reasons—a very deferential standard that we have, in fact, deemed "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (quoting *Rice v. Barnhart*, 384 F.3d 363, 372 (7th Cir. 2004)).

Elder does not argue that Dr. Hanus's opinions should have been afforded controlling weight; she has thus waived the point. *See APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002). But even if she had raised the issue, her argument would have failed. Dr. Hanus's opinion that Elder could rarely lift more than 10 pounds and could never lift more than 20 pounds conflicted with substantial medical evidence showing that Elder's fibromyalgia was not disabling. Specifically, Dr. Holton determined that Elder had no difficulty walking, had normal muscle strength and tone,

and could grip 25 pounds with both hands. Dr. Shah proffered a similar assessment, while adding that Elder could lift and carry 25 pounds occasionally and 20 pounds frequently; Dr. Shah also opined that Elder's fibromyalgia was "unremarkable." In light of these conflicting medical opinions, we cannot see how Dr. Hanus's opinion could have been afforded controlling weight. *See Skarbek*, 390 F.3d at 503.

But that aside, the ALJ did not err by refusing to afford Dr. Hanus's opinion even "substantial weight." The ALJ explained that he discounted Dr. Hanus's opinion because he was "not a specialist" in fibromyalgia, and failed to conduct "a thorough corroborating medical exam" to assess the severity of Elder's conditions. These reasons are sound and supported by the record. Elder does not dispute that Dr. Hanus was not a specialist in fibromyalgia—nor could she because Dr. Hanus is not a rheumatologist. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist."); *see also* 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Moreover, the record does not show that Dr. Hanus conducted a medical exam—much less a "thorough" one—corroborating Elder's claims of the severity of her fibromyalgia. Although Dr. Hanus offered a preliminary diagnosis of Elder's fibromyalgia, he referred her to Dr. Ko's care both to confirm that diagnosis and to provide specialized treatment for her ailments. *See id.* § 404.1527(d)(2)(ii) ("For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations,

we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain."). And even after Dr. Ko discharged Elder, Dr. Hanus did nothing to assess the severity of her ailments; indeed, Dr. Hanus offered only general palliative care in the form of pain medication and medical excuses from work. *See id.* ("We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed . . . ."). Thus, it makes no difference if Elder saw Dr. Hanus "every two-and-a-half months"; what does matter is that Dr. Hanus did not confirm the severity of Elder's fibromyalgia with medical examinations or tests. *See id.* § 404.1527(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."). And because the ALJ "minimally articulated" his reasons for declining to afford Dr. Hanus's medical opinion "substantial weight," *see Berger*, 516 F.3d at 545, we see no fault in his determination.

## III. CONCLUSION

We AFFIRM the district court's judgment.