[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 16, 2010
JOHN LEY
CLERK

_____

No. 09-12067
Non-Argument Calendar

_____

D. C. Docket No. 08-00269-CV-J-TEM

REBECCA SOMOGY,

Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 16, 2010)

Before TJOFLAT, BIRCH and ANDERSON, Circuit Judges.

PER CURIAM:

Rebecca Somogy appeals the district court's order affirming the Social Security Commissioner's ("Commissioner") denial of disability benefits, 42 U.S.C. § 405(g). Because the Administrative Law Judge ("ALJ") improperly discredited the residual functional capacity ("RFC") assessment of Somogy's treating physician, we VACATE the judgment of the district court and REMAND to the district court with instructions to remand the case to the Secretary for reconsideration of Somogy's request for benefits.

## I. BACKGROUND

Somogy applied for social security disability insurance benefits on 7 December 2004, alleging a disability onset date of 21 May 2002. Administrative Record ("AR") at 53, 55-65, 67.[1] In her 20 January 2005 disability report, Sogomy alleged that she was unable to work due to fibromyalgia and restless leg syndrome ("RLS"). Id. at 66-67. The Commissioner denied both her application and her motion for reconsideration in April and June 2005, respectively. Id. at 40-41, 45-46. On appeal from the initial denial of her request for benefits, Somogy stated that her condition had changed since her original disability report and that she was experiencing "tingly, burning, and painful" sensations in her legs and hips, "more frequent attacks," increasing pain, and "exhaustion 90% of the time." Id. at 86.

---

[1] The record does not appear to include a copy of Somogy's original application.

2

Somogy thereafter requested and received a hearing before an ALJ, which was held on 20 March 2007. Id. at 382-442.

At her hearing, Somogy testified as follows. She was previously employed as a secretary and administrative assistant at various medical facilities. Id. at 388-93. She also worked as a cake decorator in 1986 and 1987, but had to quit this job due to an injury that caused paralysis in two of her fingers. Id. at 393, 419-20. Somogy sought medical treatment when she began experiencing muscle weakness "from head to toe" and a constant "flu feeling [that] . . . just hurt everywhere." Id. at 399. She suffers from fibromyalgia and RLS and has been unable to work since 2002. Id. at 394-95, 397-98, 402.

Somogy can drive and do housework, including laundry, baking, making her bed, and dishwashing, however she must take frequent breaks when washing dishes to sit down, and is in "about three to four days a week." Id. at 419-21, 430. She is able to sit for between twenty and thirty minutes, but must stand after that point because her legs go numb and she experiences pain in her hip. Id. at 402, 420-21. She has never had any epidurals, facet blocks, or steroid injections in her hip or back, however. Id. at 421. Somogy was prescribed a cane, but had been using a walker for several weeks because weakness in her right leg was causing her to fall frequently. Id. 397-98, 424-26. She is able to shop for groceries, with the

3

assistance of her daughter, about three or four times a week. Id. at 423-24. She can lift a gallon of milk and stand in the check-out line for five to seven, sometimes ten, minutes, after which her legs get "very weak" and "wobbly." Id. at 424. The pain caused by grocery shopping is often so severe that she has to spend the entire day in bed after a trip to the store. Id. at 430-31. Somogy does not visit family and friends because she "do[esn't] have the energy to," and she is not involved in any social groups, although she attends church "when [she] can" Id. at 426, 428. She is chronically tired and in pain and generally has three "bad days," marked by an inability to leave her bed or do any work around the house, for every one "good" day when she is not in debilitating pain. Id. at 431-33. She does not have the stamina to perform even an easy sedentary job on a full-time basis due to her "weakness, tiredness, [and] cramping." Id. at 429. She feels as though she has the flu "all the time," and described her pain as a "six" on a scale of one to ten, with one being no pain. Id. at 429, 432.

The medical records of Somogy's primary care physician, Dr. Susan Salehi, who has treated Somogy since 2000, reflect that Somogy first complained of "aching all over" in September 2000. Id. at 122. After Somogy reported pain and tenderness in her right shoulder in April 2002, Dr. Salehi noted that Somogy's range of movement was decreased in all directions. Id. at 115. Somogy

4

complained again of pain and aching "all over her joints [and] body" in May 2002. Id. at 113-14. Dr. Salehi noted during an August 2002 examination that Somogy was experiencing pain upon palpation of occipital trigger points in her neck and was suffering from "fibromylagia vs. depression." Id. at 157. Dr. Salehi noted "myalgia/fibromyalgia," indicated by achiness and fatigue, in September and October 2002, and in December she noted chronic lower back pain, head and chest congestion, and bilateral ear pain. Id. at 152-55.[2] Dr. Salehi's progress notes further indicate that Somogy complained during separate visits of pain in her calf muscle, occasional dizziness, stiffness, and severe tenderness in her jaw.[3] Id. at 117-119.

Dr. Salehi referred Somogy to Dr. Mirna Barakat, a rheumatologist, for treatment of her fibromyalgia, in October 2003. Id. at 168. Dr. Barakat treated Somogy from 2003 until 2007. See id. at 164-67, 288-96, 380. During this period, Dr. Barakat diagnosed Somogy with fibromyalgia, fatigue, restless leg pain, sleep disorder, and bursitis. See id. In particular, Dr. Barakat noted subjective leg

---

[2] Between 2000 and 2002, Somogy complained of numerous ailments, including itchy eyes, chronic cough, fatigue, sleeplessness, and achy pain. She was prescribed several medications, including Paxil, Prizide, Atenolol, Premarin, Prometriu, Antivert, Phenergan with Codein, Marifed DM, Zyrtec, Wellbutrin, Toradol, and Nasacort. Id. at 113-17, 120-23, 152-55, 157.

[3] The date stamps on these progress notes are illegible.

5

weakness and parasthesia[4] in April 2005, episodic diffuse fatigue and weakness in October 2005, increased falling and tripping in June 2006, and swelling and giving way of the right knee in March 2007.  Id. at 288, 291, 293-94.  Dr. Barakat prescribed medications, including Flexeril and Celebrex,[5] and physical therapy to treat these conditions.  See id. at 164-67, 289-90, 292-95.

Dr. William Choisser, a consulting physician, performed a physical examination of Somogy on 29 March 2005.  Id. at 177.  He found that Somogy's grip and fine dexterity were "5/5 and equal bilaterally"; she was able to perform leg raises to thirty degrees on the right and fifty degrees on the left, when both seated and lying face up; her pulses and reflexes were 5/5 and equal in all extremities; and there was no major pain, swelling, heat, or redness in or of any joints or extremities.  Id.  Dr. Choisser noted that while the range of movement of the lumbar spine was within normal limits, Somogy had a "mild paravertebral muscle spasm" along her lumbar spine.  Id.  Dr. Choisser further found that although Somogy was able to walk a short distance without the use of an assistive

---

[4] Parasthesia, which often is a symptom of fibromyalgia, is an abnormal sensation, particularly in the hands and/or feet, that can be described as crawling, prickling, tingling, burning, itching or numbness.

[5] Flexeril is a muscle relaxant that is often used together with physical therapy to treat muscle pain. Celebrex is a nonsteroidal anti-inflammatory used to treat pain or inflammation caused by conditions such as arthritis.

device, "[h]eel to toe walking [was] impossible." Id. at 177. He emphasized that while Somogy could sit, stand, walk, and engage in some occasional lifting, "she [could not] do this on any predictable basis." Id. Dr. Choisser diagnosed Somogy with RLS and progressive fibromyalgia. Id.

Somogy saw Dr. Victor Maquera, a neurologist, in May 2005, for treatment of her subjective leg weakness. During a 12 May 2005 examination, Somogy reported numbness and tingling along with burning in both lower extremities, and "constant and unremitting" pain in her right leg, radiating to her right hip. Id. at 221. Somogy explained that she experienced weakness in her legs that caused her to fall frequently, which resulted in back pain. Id. Dr. Maquera noted a moderate decrease in sensation in the right and left feet and in the legs from the knees down as well as diminished ankle reflexes. Id. at 222. Somogy's stress and tandem gaits were normal. Id. The following day, Somogy underwent electrodiagnostic testing, which revealed normal nerve conduction in the bilateral lower extremities. Id. at 230. Dr. Maquera further noted that "H-reflex studies were within normal range." Id. Magnetic resonance imaging ("MRI") of the thoracic spine on 17 May 2005 revealed mild thoracic scoliosis, but "no other significant abnormalities" were identified. Id. at 220. An MRI of the lumbar spine performed the same day showed "very mild lumbar scoliosis," but was otherwise unremarkable. Id. at 219.

During an 8 June 2005 examination, Somogy reported difficulty sleeping due to burning pain in her right leg; "stabbing pain" in her neck, radiating down the right side of her body; and occasional blurry vision. Id. at 217. Dr. Maquera noted that Somogy's neck pain, which was exacerbated by sitting for long periods, was not typical of the pain generally associated with fibromyalgia. Id. Dr. Maquera further noted "severe tenderness" upon "very light palpation in the right cervical paraspinous and trapezious muscle regions with mild spasm" and decreased sensation in a glove and stocking distribution on Somogy's left side.[6] Id. An MRI of Somogy's cervical spine done on 18 June 2005 showed "mild cervical scoliosis, which may be positional in nature." Id. at 246.

State agency consultants prepared RFC assessments in April and July 2005. Id. at 180-216, 232-39. The first RFC form stated that although Somogy would never be able to climb ramps or stairs, she could: (1) lift twenty pounds occasionally[7] and ten pounds frequently; (2) stand, walk, and sit for a total of six hours in an eight-hour work day; (3) climb ladders, ropes, or scaffolds occasionally; (4) balance, stoop, and crouch occasionally; and (4) kneel and crawl

_____

[6] Symptoms related to peripheral neuropathy, including pain and numbness, are generally stronger in the distal hands and feet and are therefore referred to as having a "glove-stocking distribution."

[7] "Occasionally" was defined on the RFC form as at least one-third, but less than two-thirds, of the time. Id. at 196, 234.

frequently. Id. at 197. The form noted that Somogy had no manipulative, communicative, or visual limitations, but should "avoid concentrated exposure" to extreme temperatures, vibrations, and hazards such as machinery and heights. Id. at 198-99. The second RFC form was similar to the first, except that it stated that Somogy could stand or walk for two to four, rather than six, hours in an eight-hour day. Id. at 233. The form also reflected that Somogy's physical examination was normal with the exception of mild lumbar scoliosis and decreased sensation in the right and left feet and legs. Id. It also concluded that Somogy could climb, balance, stoop, kneel, crouch, and crawl occasionally. Id. at 234.

On 1 June 2006, Dr. Barakat recommended that Somogy undergo another neurological evaluation after observing that Somogy still showed symptoms of fibromyalgia and was experiencing increased tripping and falling. Id. at 290-91. Dr. Barakat described Somogy's fibromyalgia as "stable" on 27 June 2006, but noted that Somogy's RLS symptoms persisted, and recommended that Somogy "continue past exercise." Id. at 290. Dr. Barakat referred Somogy to Dr. Maquera again in October 2006 after Somogy complained of numbness in her feet and legs accompanied by headaches. Id. at 256.

On 18 October, Dr. Maquera noted that Somogy's feet become numb if she sits or is prone for more than five minutes. Id. Somogy also indicated that she was

9

tripping and falling frequently and experiencing "overwhelming" feelings of fatigue and generalized weakness. Id. Dr. Maquera observed that while Somogy's tandem gait was abnormal, she was able to walk heel-to-toe with support. Id. An MRI of the brain on 21 October was unremarkable and electrodiagnostic tests performed on 27 October "reveal[ed] a normal nerve conduction of the bilateral lower extremities," which Dr. Maquera noted was "unchanged" from the diagnostic nerve conduction studies performed in May 2005. Id. at 266. Dr. Maquera's treatment notes from 31 October reflect that Somogy was experiencing almost daily headaches, numbness in her feet, and pain in her right knee, radiating up the front of her thigh. Id. at 254. Somogy reported that both knees occasionally gave way, but that the pain was confined to her right knee and unaccompanied by any swelling or redness. Id. Dr. Barakat noted during a 15 December 2006 examination that Somogy's fibromyalgia appeared to be "stable" and recommended that she exercise and continue to walk and stretch. Id. at 289.

Dr. Maquera completed a physical RFC assessment on 13 February 2007. See id. at 268-72. With respect to Somogy's ability to deal with work-related stress, he stated that he "suspect[ed] moderate limitation," though the degree of her limitation was "unknown." Id. at 270. He concluded that she was able to sit continuously and stand intermittently for more than two hours, but noted that these

10

findings were based on Somogy's subjective complaints of pain and knee weakness and not on objective testing.  Id.  He further concluded that Somogy would need to be able to (1) walk for five minutes every hour during an eight hour day, (2) shift positions at will from sitting, standing, or walking, and (3) take unscheduled breaks of up to fifteen minutes at least one to two times in an eight hour day.  Id. at 270.  In addition to these limitations, Dr. Maquera found that Somogy could lift fewer than ten pounds frequently and ten pounds only occasionally and could never lift twenty pounds or more.  Id. at 271.  Although Somogy was not significantly limited in her ability to do repetitive reaching, handling, or fingering, Dr. Maquera concluded that Somogy's impairments were likely to produce "good days and bad days" and that she was likely to miss more than three days of work in any given month.  Id. at 271-72.  Dr. Maquera emphasized that his RFC findings were based on "significant subjective symptomology" and that Somogy's neurological exam was normal.  Id. at 272.

Dr. Choisser examined Somogy again on 7 March 2007 and found that Somogy: (1) had a "contracture deformity in the proximal joint of each of the last [two] fingers of the right hand"; (2) was able to raise both legs thirty to forty degrees; (3) had a normal gait with a fall to the right on heel to toe walking; and (4) was able to stand "weakly" on her heels and toes, squat fifty percent of the way

11

to the floor, and stand up without assistance. Id. at 274-75. He concluded that Somogy suffered from "chronic and severe pain from fibromylagia which is exacerbated by ordinary activities such as sitting, standing, and walking." Id.

That same day, Dr. Choisser completed an RFC questionnaire, in which he diagnosed Somogy with fibromylagia, knee pain, "possible torn cartilage," RLS, and panic disorder. Id. at 276-78. He noted that Somogy: (1) suffered pain when flexing her knee; (2) experienced drowsiness and memory loss as a result of her RLS medication; (3) was "moderate[ly] limit[ed]" in her ability to deal with work-related stress; (4) could sit or stand continuously for thirty minutes, but could sit, stand, or walk only for fewer than two hours total in an eight-hour day; (5) would need to "walk around" for ten minutes every thirty minutes over the course of an eight-hour day; (6) required the use of a hand-held cane; (7) could lift fewer than ten pounds occasionally, but could never lift anything weighing ten pounds or more; and (8) was able to use her right hand and fingers only five percent of an eight hour workday. Id. at 277-80. He indicated that Somogy would not have "good days and bad days" because her days would be "mostly bad," and that she was likely to miss more than three days of work a month because of her impairment. Id. at 280.

On 8 March 2007, Dr. Salehi also prepared an RFC Questionnaire, in which

12

she stated that she saw Somogy every three months for fibromyalgia, characterized by constant "severe fatigue, body pain, [and] weakness." Id. at 282-83. Dr. Salehi noted that, as a result of this condition, Somogy also suffered from depression, anxiety, and "somatoform disorder"[8] and was "severe[ly] limit[ed]" in her ability to cope with work-related stress. Id. at 283-84. Dr. Salehi determined that Somogy was able to sit for only thirty minutes at a time and to stand for only ten minutes at a time and that she had to get up and walk every thirty minutes for a five-minute interval. Id. at 284. Dr. Salehi further concluded that Somogy: (1) would have "significant limitations doing repetitive reaching, handling, or fingering"; (2) would be able to use her hands, fingers, and arms during zero percent of a normal work day; (3) was sensitive to "temperature [and] noise"; and (4) was likely to be absent from work more than three times per month due to her impairments. Id. at 285-86.

On 9 March 2007, Dr. Barakat completed a physical RFC questionnaire, in which she concluded that Somogy suffered from fibromyalgia, indicated by "tender points" along her spine and on her elbows, knee, hips, and shoulders. Id. at 298. Dr. Barakat stated that Somogy's pain was severe enough to interfere "frequently" or "constantly" with her attention and concentration and that she had a

---

[8] A "somatoform disorder" is a mental disorder characterized by physical symptoms that mimic physical disease or injury for which there is no identifiable physical cause.

13

"marked limitation" in her ability to handle work-related stress. Id. at 299-300.

Dr. Barakat further found that Somogy: (1) was able to sit for between five and ten minutes and stand for ten minutes, and would need to walk every ten minutes for five to ten minutes at a time; (2) would need to be able to shift positions at will; (3) would need to take unscheduled breaks of at least ten or more minutes every fifteen to thirty minutes; (4) would need to use a walker to engage in "occasional standing/walking"; (5) would need to have her legs elevated 100% of an eight hour day; (6) was only occasionally able to lift fewer than ten pounds; (7) had "*significant limitations* in doing *repetitive* reaching, handling, or fingering" and was able to use her right hand for repetitive motion only ten percent of the day; (8) would experience "good days and bad days"; and (10) would likely be absent from work more than three times per month because of her impairments. Id. at 298-302 (emphasis added). Dr. Barakat concluded that, based on these limitations, Somogy was "unable to work." Id. at 300.

In addition to Somogy's medical records, the ALJ also considered the testimony of a vocational expert ("VE"), who testified that an individual of Somogy's age, education, and other vocational factors, who had no manipulative limitations and who could: (1) sit, stand, and walk for at least six hours in a normal day; (2) lift twenty pounds up to one-third of the work day and ten pounds less

14

frequently; and (3) bend, stoop, crouch, crawl, kneel, and climb occasionally, would be able to perform the sedentary work that Somogy had performed in the past. Id. at 436-38.

The ALJ denied disability benefits after concluding that, while Somogy had several severe impairments, including, inter alia, a history of fibromyalgia, RLS, degenerative disc disease, and lumbar scoliosis, she did not have an impairment or combination of impairments that meets or equals one of the impairments listed in 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526. He further determined, "[a]fter careful consideration of the entire record," that Somogy "has the residual functional capacity to li[f]t and carry up to 20 pounds occasionally and up to 10 pounds frequently, sit [for] up to 6 hours in an 8 hour workday, stand/walk for up to 6 hours in an 8 hour workday, with occasional bending, stooping, crouching, crawling, kneeling and climbing, [and] work in a temperature controlled environment." Id. at 15-16. He also found that although Somogy required a hand-held cane when walking, she "has no manipulative, communicative or mental impairments." Id. at 16. The ALJ concluded that Somogy was able to perform her past relevant work, which did not require her to engage "work-related activities precluded by [her] credible residual functional capacity." Id. at 21. In making this determination, the ALJ found that Somogy's testimony regarding the intensity and

15

limiting effects of her fibromyalgia were "not entirely credible," and accorded little or no weight to the RFC determinations of Drs. Maquera, Choisser, Barakat, and Salehi on the grounds that they were based on Somogy's subjective complaints, not supported by their clinical findings, and/or inconsistent with the medical record in general.[9] Id. at 20-21.

After the Appeals Council denied Somogy's request for review, Somogy appealed to the district court, arguing that the ALJ erred in: (1) discrediting her testimony regarding the frequency of her headaches[10] and (2) discounting the opinions of Drs. Salehi, Barakat, and Choisser in determining her RFC. See id. at 4-6; R1-1; R1-13 at 9-14. The SSA and Somogy both consented to a ruling by a magistrate judge, who affirmed the ALJ's denial of benefits. R1-7, 16.

## II. DISCUSSION

We review a social security case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied. See Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir.

---

[9] The ALJ did not identify what medical evidence he was relying on in determining Somogy's RFC.

[10] Somogy has abandoned this claim by failing to raise it in her initial brief on appeal. See North Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1217 n. 4 (11th Cir. 2008) (noting that "issues not raised on appeal are abandoned").

16

1997). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Id.; see Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986) (per curiam) (stating that while the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support"). On appeal, Somogy argues that neither the ALJ's decision to discount the opinions of Drs. Barakat and Choisser nor the ALJ's RFC determination were supported by substantial evidence.

When evaluating an applicant's claim for social security disability benefits, the ALJ must give "substantial weight" to the opinion of the applicant's treating physician "*unless* good cause exists for not heeding the treating physician's diagnosis." Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) (emphasis added); see also Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985) (per curiam) ("[I]t is not only legally relevant but unquestionably logical that the opinions, diagnosis, and medical evidence of a treating physician whose familiarity with the patient's injuries, course of treatment, and responses over a considerable length of time, should be given considerable weight." (quotation marks and citation omitted)); see also Donato v. Sec'y of Dep't of Health and Human Services, 721 F.2d 414, 419 (2d Cir. 1983) ("The ALJ's apparent rejection of the treating physicians' medical conclusions must be evaluated under the rule that the expert

17

opinions of a treating physician as to existence of a disability are binding on the fact finder unless contradicted by substantial evidence to the contrary." (quotation marks, alterations, and citation omitted)).

We have held that "good cause" exists where: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. Lewis, 125 F.3d at 1440 (quotation marks and citations omitted). "[E]ven if the evidence preponderates against the Secretary's decision, we must affirm if substantial evidence supports the disability determination." Harwell v. Heckler, 735 F.2d 1292, 1293 (11th Cir. 1984) (per curiam). If the ALJ disregards or accords less weight to the opinion of a treating physician, the ALJ must clearly articulate his reasons, and the failure to do so is reversible error. Lewis, 125 F.3d at 1440.

The ALJ accorded little weight to Dr. Barakat's RFC assessment on the grounds that it was based on Somogy's subjective complaints rather than objective medical evidence and because "[Somogy] may not have seen Dr. Barakat from October 2003 until March of 2007 when the RFC questionnaire was completed." AR at 20. We first note that the ALJ's latter determination is flatly contradicted by the record, which reflects that Somogy visited Dr. Barakat at least ten times

18

between October 2003 and March 2007.  See id. at 164-66, 287-88, 290-91, 293-95.  To the extent that the ALJ's decision was based on this clearly erroneous finding of fact, it is not supported by substantial evidence.

We also find unpersuasive the ALJ's only other stated reason for discounting Dr. Barakat's RFC, namely, that the limitations imposed therein "are based primarily upon [Somogy's] subjective complaints."  Id. at 20.  We, along with several other courts, have recognized that fibromyalgia "often lacks medical or laboratory signs, and is generally diagnosed mostly on an individual's described symptoms," and that  the "hallmark" of fibromyalgia is therefore "a lack of objective evidence."  Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam); see also Rogers v. Comm'r of Social Sec., 486 F.3d 234, 243 (6th Cir. 2007) (stating that "fibromyalgia patients present no objectively alarming signs"); Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (explaining that "there are no objective tests which can conclusively confirm [fibromyalgia]" (quotation marks and citation omitted)); Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996) (noting that "[t]here are no laboratory tests for the presence or severity of fibromyalgia").  The lack of objective clinical findings is, at least in the case of fibromyalgia, therefore insufficient alone to support an ALJ's rejection of a

treating physician's opinion as to the claimant's functional limitations.[11] See

Green-Younger, 335 F.3d at 105-08 (holding that because fibromyalgia is "a

disease that eludes [objective] measurement," ALJ improperly discredited treating

physician's disability determination based upon lack of objective evidence).

Given the nature of fibromyalgia, a claimant's subjective complaints of pain

are often the only means of determining the severity of a patient's condition and

the functional limitations caused thereby. See id. at 107. In this case, the record

shows that Somogy consistently reported symptoms of fibromyalgia, including,

inter alia, chronic muscle pain, severe fatigue, pain upon palpation of tender points,

insomnia, jaw pain/tenderness, numbness in the legs and feet, dizziness, and

depression, both before and after diagnosis, and that Somogy's physicians

consistently noted and credited these complaints. Other than a lack of objective

medical findings, there is nothing in the record to suggest that Somogy did not

suffer the degree of pain she reported or that her doctors should have disbelieved

---

[11] We note, moreover, that contrary to the ALJ's assertion that "no objective findings fully consistent with fibromyalgia such as . . . diffuse muscle and joint pain, trigger points, etc." had been made, Dr. Barakat's notes include clinical findings of "episodic diffuse fatigue" and her RFC states that Somogy's impairment is indicated by "tender points" in the paraspinals, elbows, knee, hips, and shoulders. AR at 298. Although the SSA emphasizes that "tender points" were not noted earlier in Dr. Barakat's records, we fail to see how this undermines Dr. Barakat's RFC assessment, especially given that this clinical finding is consistent with Drs. Salehi's and Maquera's treatment notes, which show, respectively, that Somogy experienced pain upon "palpation of occipital trigger points" in 2002 and "severe tenderness" upon "very light palpation in the right Cervical paraspinous and Trapezious muscle regions with mild spasm" in 2005. Id. at 157, 217.

her complaints. See, e.g., Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994) (ALJ's finding that claimant's fatigue did not significantly affect his RFC was not supported by substantial evidence where "examining physicians' reports, over a period of more than 18 months, consistently noted (and credited) claimant's complaints of persistent fatigue" and the record contained no "meaningful evidence to support a finding that claimant did not suffer from a significant level of fatigue on a regular basis"). As we have already explained, however, "the nature of fibromyalgia itself renders . . . over-emphasis upon objective findings inappropriate." Rogers, 486 F.3d at 248; see also Green-Younger, 335 F.3d at 108-09 (lack of physical abnormalities did not undercut claimant's complaints of pain since physical examinations of fibromyalgia patients "will usually yield normal results").

Rather, the credibility of Somogy's complaints of disabling pain are bolstered by evidence that she made numerous visits to her doctors over the course of several years, underwent numerous diagnostic tests, and was prescribed numerous medications.[12] See Rogers, 486 F.3d at 248 (ALJ erred in discrediting

---

[12] Somogy's complaints of disabling pain are also supported by her testimony regarding her daily activities. Although Somogy testified that she was able to do laundry, shop for groceries, bake, and do other chores around the house, she also testified that these activities only could be done on her "good days." On her "bad days," of which she had three for every one "good day," she was unable to leave her bed because of her debilitating pain. See Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004) (ALJ's finding that claimant, who could perform certain daily activities, testified incredibly about the severity of her fibromyalgia, was not

21

claimant's complaints of pain where ALJ "focus[ed] on purely objective evidence" and failed "to discuss or consider the lengthy and frequent course of medical treatment or the nature and extent of that treatment, the numerous medications Rogers has been prescribed, the reasons for which they were prescribed, or the side effects Rogers testified she experiences from those medications); see also Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (ALJ erred in discrediting claimant's allegations of disabling pain where claimant made "numerous visits to doctors," was prescribed many different medications, "availed herself of many pain treatment modalities," and underwent "many diagnostic tests, including X-rays, CT scans, DNA tests, MRIs, and blood work"). The fact that Dr. Barakat relied on Somogy's complaints, which the ALJ discredited without adequate reason, in no way renders her opinion unreliable and thus cannot constitute substantial evidence to support the ALJ's decision.[13] See Green-Younger, 335 F.3d at 107.

supported by substantial evidence because "the mere fact that a plaintiff has carried on certain daily activities does not in any way detract from her credibility as to her overall disability" (quotation marks, alteration, and citation omitted)); see also Brosnahan v. Barnhart, 336 F.3d 671, 677 (8th Cir. 2003) ("[I]n the context of a fibromyalgia case, . . . the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity.")

[13] Although Dr. Barakat was Somogy's treating physician for well over three years and, as a rheumatologist, is a specialist in the diagnosis and treatment of rheumatic diseases, including fibromyalgia, the ALJ does not appear to have considered these important factors in deciding how much weight to accord her opinion. See 20 C.F.R. §§ 404.1527(d)(2), (5); see also Benecke, 379 F.3d at 594 n.4 (noting that "[s]pecialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community," and thus rheumatologists' opinions were entitled to greater weight

22

Finally, the ALJ's decision was also unsupported by substantial evidence to the extent that it was based on a finding that Dr. Barakat's RFC assessment was inconsistent with the medical record in general. Dr. Barakat's RFC assessment is, as previously discussed, consistent with Somogy's repeated reports of debilitating pain as well as with the other physicians' treatment notes, which indicate, inter alia, a limited range of motion, pain upon palpation of tender points, episodic diffuse fatigue, decreased sensation in the feet and legs, diminished ankle reflexes, mild thoracic, lumbar, and cervical scoliosis, abnormal tandem gait, and an inability to heel-to-toe walk. Based on the record before us, we cannot conclude that Dr. Barakat's RFC determination is "contradicted by substantial evidence to the contrary."[14] See Donato, 721 F.2d at 419. Because the ALJ failed to articulate good cause for discrediting Dr. Barakat's RFC determination and we remand on that basis, we need go no further.

### III. CONCLUSION

Somogy appeals the Commissioner's denial of social security benefits.

---

than those of other physicians); cf. Elder v. Astrue, 529 F.3d 408, 416 (7th Cir. 2008) (ALJ did not err in declining to accord controlling or even substantial weight to opinion of physician who was not a specialist in fibromyalgia).

[14] Even if we were to conclude that the ALJ properly accorded no weight to Dr. Choisser's RFC assessment, the ALJ's improper rejection of Dr. Barakat's opinion is sufficient to warrant remand since, as Somogy's treating physician, her opinion is due "substantial" or "considerable" weight.

Based on the foregoing, we VACATE the judgment of the district court and REMAND to the district court with instructions to remand the case to the Commissioner for further findings and/or proceedings consistent with this opinion.