NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 6, 2013
Decided April 15, 2013

**Before**

DANIEL A. MANION, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 12-2721

| | |
|---|---|
| RONALD P. WURST, | Appeal from the United States District |
| *Plaintiff–Appellant,* | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 10 C 4142 |
| CAROLYN W. COLVIN, | |
| Acting Commissioner of Social Security, | Morton Denlow, |
| *Defendant–Appellee.* | *Magistrate Judge.* |

**O R D E R**

Ronald Wurst says that he is disabled by obesity, arthritis in his knee, and nerve damage in his extremities. He applied for disability insurance benefits and supplemental security income, but his application was denied at each stage of review. A magistrate judge, presiding by consent, upheld the denial. Because the administrative law judge's disability determination is supported by substantial evidence, we affirm the judgment.

In 2008 Wurst, then 50, applied for disability benefits and supplemental security income, claiming that he had become disabled the previous year. His physical problems, however, dated back to 2000 when—as a self-employed mechanic—he began experiencing numbness in his hands, legs, and feet. By 2005 the pain in his feet led him to see his

primary-care physician, Dr. David Cespedes. Dr. Cespedes referred Wurst to Dr. John Mytych, a podiatrist, who diagnosed him with osteoarthritis in his feet and diabetic peripheral neuropathy (nerve damage caused by diabetes) in his hands, legs, and feet. Mytych recommended ankle–foot orthotics and pain medication. After his condition worsened, Wurst sold his business but continued to work as a mechanic in another car shop.

In 2006 Wurst injured his knee at work. He underwent a procedure performed by Dr. Shawn Palmer, an osteopathic physician, to remove damaged cartilage from his knee, but received no relief. The following year Wurst underwent a partial knee replacement. In the weeks after surgery, Dr. Palmer described Wurst's condition as "wonderful" and noted that he could walk independently. And after two months of physical therapy, Wurst's physical therapist released him back to work full time without restrictions. He lasted only two weeks, however, before pain in his knee and feet returned and sidelined him.

In 2008 the state agency's physician, Dr. Ernst Bone, reviewed all of Wurst's medical records in connection with his application and completed a residual functional capacity ("RFC") assessment. In that assessment Dr. Bone concluded that Wurst could occasionally lift 20 pounds; frequently lift 10 pounds; and stand, walk, and sit up to 6 hours in an 8-hour workday; but he had limited pushing and pulling abilities in his lower left extremity.

Two other physicians, however, reported that Wurst had more significant limitations. Dr. Mytych, the podiatrist, examined Wurst again in 2008 and noted his complaints of pain after only 15 to 30 minutes of standing. He diagnosed "severe osteoarthritis" in Wurst's rear right foot and suggested that he "may very well evolve to being on disability" given his former work as a mechanic. Dr. Mytych also referred Wurst to Dr. Lucie Bianchi, a family-practice physician, who completed a medical examination of Wurst in February 2009 (more than a year after his last date insured) and concluded that his ability to walk and stand was compromised by more than 50%.

At his hearing before an ALJ in 2009, Wurst testified that he had largely recovered from his knee-replacement surgery but still had difficulties with stooping, crouching, crawling, and kneeling. He said he could walk up to four blocks at one time without the use of a walking aide, though he sometimes used a cane or shopping cart to steady himself in stores. On a bad day, he could stand for two to three hours and sit for up to four hours, and on a good day could stand an hour longer before having to change positions. He could lift 50 pounds (he did not clarify whether he meant once or repeatedly) but about half of the time had trouble gripping things. He could drive, cook, wash dishes, do laundry, and use a leaf blower, but could not walk his dog.

A vocational expert also testified at the hearing. In his opinion a person with Wurst's vocational background who could perform light-duty work—but with limitations on bending and using stairs—could still work as an oil-change mechanic, of which 9,200 positions existed in the area. If this person also needed to vary between sitting and standing every hour, the VE testified, he could still work as a hand assembler, hand packer, and hand sorter, of which over 11,000 positions existed in the area.

The ALJ found Wurst not disabled after evaluating his claim under the five-step sequence set forth in 20 C.F.R. § 404.1520(a)(4). The ALJ concluded that Wurst had not worked since his alleged onset date (Step 1); his knee and feet problems and obesity qualified as "severe" impairments (Step 2); his impairments did not meet or medically equal a listed impairment (Step 3); his RFC allowed him to perform light-duty work, which precluded his past work as a mechanic (Step 4); and he could work as an assembler, packer, or sorter (Step 5). In evaluating Wurst's RFC, the ALJ discredited Wurst's testimony regarding his symptoms because it was contradicted by the medical evidence and Wurst's previous written statements.

Of Wurst's many arguments on appeal, we first address his challenge to the ALJ's adverse credibility determination, which affects all of his other arguments. Wurst points out that the ALJ's credibility determination consists of boilerplate language that this court has repeatedly criticized: "[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." We have indeed criticized such language, *see, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012); *Martinez v. Astrue*, 630 F.3d 693, 694 (7th Cir. 2011); *Parker v. Astrue*, 597 F.3d 920, 921–22 (7th Cir. 2010), but we have also noted that its use is harmless if the ALJ provides additional reasons for her finding, *see Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Shideler v. Astrue*, 688 F.3d 306, 311–12 (7th Cir. 2012). Here the ALJ properly discounted Wurst's testimony of his difficulty standing and walking because it conflicted with other parts of his testimony and medical records suggesting that his mobility was not so limited.

Wurst next challenges the ALJ's determination at step three that his impairments did not meet or medically equal a medical listing. He dismisses as "perfunctory" the ALJ's single-sentence explanation: "The claimant's impairments, alone or combined[,] do not meet or medically equal the criteria of 1.02 or 1.03 of the Listing of Impairments as he is able to ambulate effectively without the use of an assistive device." This brief statement, he says, failed to consider the medical evidence and Wurst's testimony that he had difficulty ambulating.

In deciding whether an impairment meets or equals a listed impairment, an ALJ must mention the relevant listings and make more than a "perfunctory analysis" of whether the impairment meets the criteria. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). The listings the ALJ mentioned here, for chronic joint pain and reconstructive surgery of a weight-bearing joint, *see* 20 C.F.R. § 404 subpt. P, app. 1, require an inability to ambulate effectively—defined as "an extreme limitation of the ability to walk" or a serious interference "with the individual's ability to independently initiate, sustain, or complete activities," *id.* §§ 1.00(B)(2)(b)(1), 1.02, 1.03. Effective ambulation, according to the regulations, requires the ability to sustain a "reasonable walking pace over a sufficient distance" without assistance so that the individual can carry out basic activities of daily living. *Id.* § 1.00(B)(2)(b)(2).

The ALJ's analysis here was cursory, but it was nevertheless supported by substantial evidence that Wurst could ambulate effectively. The ALJ accounted for Wurst's difficulty on stairs and using his hands but also noted his testimony that he could walk up to four blocks before he would need to sit and rest, stand uninterrupted for 3 hours, and perform basic household tasks that require standing or moving about. *See Kastner v. Astrue*, 697 F.3d 642, 650 (7th Cir. 2012) (ALJ may include evidence of household activities in determining whether claimant can ambulate effectively). And the medical evidence contradicted Wurst's complaints and showed that after his knee surgery, he left the hospital fully weight-bearing without the need of a walking aide.

Wurst next contests the ALJ's RFC determination that he could perform "light work." He argues that the evidence documents his difficulties standing for more than 2 to 3 hours at a time and belies the ALJ's determination that he could stand for 6 of 8 hours of a workday (as required for a light-work classification), though he cites only his testimony from the hearing and medical evidence from either years before his knee replacement or more than one year after his last date insured. He also says that the ALJ failed to cite evidence supporting her conclusion and improperly credited Dr. Bone's opinion over that of his treating physicians.

An ALJ need not detail every reason for discounting a treating physician's report, *see Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), and her explanation here was adequate. The ALJ first reviewed the relevant evidence in the record and acknowledged Wurst's reported limitations, appropriately discounting his testimony (discussed above). Second, the ALJ properly accorded less weight to the opinions of Drs. Mytych and Bianchi because objective medical evidence, including Dr. Mytych's own treatment notes, contradicted Dr Mytych's assessment of

Wurst's ability to walk and stand as well as Dr. Bianchi's statement regarding how frequently she had seen Wurst. *See* 20 C.F.R. §§ 404.1545(a), 404.1527(c)(2–3), (6); *Hofslien v. Barnhart*, 439 F.3d 375, 376–77 (7th Cir. 2006); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). (In fact, Dr. Bianchi saw Wurst only once, more than one year after Wurst's last date insured.) The ALJ then properly credited the remaining reports of Dr. Palmer, Wurst's physical therapist, and Dr. Bone—reports suggesting that Wurst could walk and stand without significant limitations and supporting a light-work RFC classification.

Wurst next asserts that the hypothetical questions posed to the VE, like the RFC determination, failed to convey his balance issues, standing and bending limitations, and pain in his feet. He also challenges the VE's conclusion that he could perform several types of jobs widely available in the area and the VE's statement that he had "read exhibits and heard [Wurst's] testimony" in preparing his opinion. But the hypothetical was based on the ALJ's RFC determination, so Wurst's objection only repeats his challenge to the RFC (discussed above). *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012); *Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005). And in any case, the ALJ included in her hypothetical questions Wurst's bending and kneeling limitations as well as his need to sit periodically.

Wurst also insists that the magistrate judge made errors similar to those of the ALJ. But since we directly review the ALJ's decision without deference to the analysis of the district court, *see Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Elder*, 529 F.3d at 413, any error in the magistrate judge's analysis is irrelevant to our review, *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998).

**AFFIRMED**.