# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-1166

CHARLES R. KASTNER,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE, Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 3:09-cv-00186—**William G. Hussmann, Jr.,** *Magistrate Judge.*

ARGUED SEPTEMBER 20, 2011—DECIDED OCTOBER 10, 2012

Before ROVNER, WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Suffering from a degenerative disc disorder and pain in various parts of his body, Charles R. Kastner sought disability insurance benefits under 42 U.S.C. § 423(d). He asserts that his disorder of the spine constitutes a disability under the Social Security Act. An administrative law judge ("ALJ") determined that, though Kastner's impairments are severe, they do not meet listed requirements for a presumptively disabling condition and that Kastner has residual

capability to perform certain jobs in the economy. After the Appeals Council denied review, Kastner sought judicial review of the denial of disability benefits, and the district court affirmed the decision of the Commissioner of Social Security. Because we conclude that the ALJ did not adequately explain why Kastner had not met the requirements for a presumptive disability, we reverse the judgment of the district court and remand for further proceedings.

## I.  BACKGROUND

Kastner was 48 years old at the time of the ALJ's decision and has past work experience as a truck driver. In 2004, he worked as a delivery manager for a hardware retailer, loading heavy pieces of equipment onto trucks for delivery to customers. On August 5, 2004, he was helping to pull a 400-pound refrigerator when he felt a pop in his neck. Though he did not immediately experience discomfort, Kastner's pain increased steadily over the next two hours. On August 16, 2004, he visited an occupational medicine clinic, which recommended a regimen of neck exercises and pain reduction therapy.

On January 4, 2005, Kastner consulted Steven Rupert, a doctor of osteopathy, complaining of pervasive pain in his lower back, neck, buttocks, hips, shoulders, and lower and upper extremities, as well as headaches. Kastner told Dr. Rupert that he had first experienced back and neck pain after an accident sixteen years earlier. Kastner had fallen from a safety ladder which broke while he was working on it. The fall caused a

slipped disc in his back and his pain had become progressively worse, particularly after he had moved the refrigerator. When tested, Kastner demonstrated clonus—muscle spasms and tremors—in his arms and legs on both sides of his body. Kastner also reported difficulty sleeping for more than three or four hours a night and that he frequently reawakened. Though he had trouble standing, stooping, and lifting, Kastner stated that he could perform most daily activities of living and Dr. Rupert concluded that Kastner had normal muscle strength in his arms and legs.

Over the next two days, Kastner underwent MRI examinations of his spine and neck. These tests indicated that Kastner was suffering from spondylosis, a degenerative disease where discs and cartilage between neck vertebrae experience abnormal wear, which can cause chronic pain. Kastner's MRIs also showed herniated discs in his neck and evidence of stenosis, a narrowing of the spinal passageway.

Following these tests, Kastner was examined by two doctors. On January 7, 2005, a neurosurgeon, Dr. Mike Chou, examined Kastner. He noted that Kastner's gait was somewhat "wobbly" and that he appeared to drag his right side but could walk into the office without difficulty. Kastner's arm strength was normal but he had muscle spasms on his right side as well as his left ankle. After reviewing the MRIs, Dr. Chou concluded that the discs in Kastner's neck were "acutely herniated" and recommended immediate surgery to correct the problem. He also told Kastner to refrain from work in the meantime and to halt therapeutic exercises.

On May 27, 2005, James Butler, a doctor at the occupational medicine clinic, gave Kastner a physical examination and reviewed his MRIs. Dr. Butler concurred with Dr. Chou that Kastner was suffering from spinal cord damage and degenerative disc disease. In addition, Dr. Butler's physical examination demonstrated limitation in Kastner's range of motion in his neck and back. However, Dr. Butler disagreed with Dr. Chou that Kastner should refrain from work altogether. Dr. Butler opined that Kastner could perform sedentary work limited to lifting a maximum of five pounds.

In a June 8, 2005 reexamination, Dr. Chou found Kastner to have sustained muscle spasms and pain from prolonged irritation and compression of spinal nerves. Dr. Chou reiterated his previous conclusion: "It is clearly ridiculous that anyone would think that there is no surgical indication here, particularly since he has myelopathy with MRI evidence of spinal cord changes. This patient should have surgery as soon as possible."

On April 4, 2006, Kastner underwent surgery performed by Dr. Chou to remove his most severely herniated cervical disc. Before the surgery, Dr. Chou had noted that Kastner's spinal disease was not limited to that disc. Kastner had stenosis and disc degeneration above and below it. Nevertheless, Dr. Chou concluded that Kastner's spinal cord was principally affected by the herniated, protruding disc scheduled for removal.

In the months following the surgery, Kastner appears to have experienced both initial improvements as well as complications to his condition. Two weeks after the

surgery, Kastner reported that the pain in his right arm, neck, and left shoulder was gone. However, he was now experiencing pain and numbness in his left arm, which he could not completely raise. Subsequent MRI and CT scans showed that Kastner's spinal column was still compressed but his condition appeared to be improving. Kastner no longer dragged his leg and could raise his left arm without as much pain. On July 3, 2006, Dr. Chou arranged to observe Kastner over the next few months but approved him for sedentary work if Kastner could tolerate it.

Other doctors concluded that Kastner's impairments were continuing to cause pain following the surgery. On June 22, 2006, Dr. Donna Lorenzo-Bueltel diagnosed Kastner with chronic nerve damage of the left shoulder blade after reviewing an EMG test. Following a referral from Dr. Lorenzo-Bueltel, Dr. Rupert diagnosed Kastner with peripheral nerve injury as well.

On August 4, 2006, Dr. John Hall conducted a consultative examination of Kastner at the request of the State Disability Determination Services. Kastner told Dr. Hall that he was continuing to have tremors and constant neck and back pain, as well as numbness and weakness in his legs. Kastner also reported that he could no longer lift objects with his left arm without significant pain. Dr. Hall observed that Kastner could walk with a relatively normal gait but had difficulty with tandem walking and squatting. In the doctor's estimation, it would be difficult for Kastner to stand or walk for 2 hours in a workday. Dr. Hall conducted a range-of-motion

evaluation and found significant limitations in Kastner's ability to bend his neck and lower back. The examination chart includes Dr. Hall's notation of "pain" beside each measurement of Kastner's diminished flexion.

On September 7, 2006, Dr. Andrew Reiners, a state agency physician and medical consultant, evaluated Kastner's condition to assess his residual functional capacity. Dr. Reiners concluded from the assessment and medical evidence in the record that Kastner could perform sedentary work.

On October 27, 2006, Kastner underwent a second surgery. A month later, Kastner told his doctor that his pain was almost completely gone. But in January and March 2007, Dr. Chou determined that Kastner's neuropathic pain had returned and that prescription medication could not resolve the problem. Dr. Chou stated that he had done all he could for Kastner and referred him for chronic pain management.

Kastner applied for disability insurance benefits on June 22, 2006. The ALJ held a hearing on November 18, 2008, in which Kastner was represented by an attorney. Kastner testified that he was unable to work due to chronic neck pain. The ALJ denied the claim finding that Kastner could perform sedentary work. The Appeals Council denied Kastner's request for review. After the district court found the ALJ's decision supported by substantial evidence, Kastner appealed.

## II. ANALYSIS

Because the Appeals Council declined Kastner's request for review, the ALJ's ruling is the final decision of the Commissioner of Social Security. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). We review this decision directly without giving deference to the district court's decision. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). But we will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006). The ALJ is not required to address every piece of evidence or testimony presented, but must provide "an accurate and logical bridge" between the evidence and her conclusion that a claimant is not disabled. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). If a decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," a remand is required. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

To determine whether a claimant is disabled, an ALJ employs a five-step inquiry which asks: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *See* 20 C.F.R. § 404.1520. Here, the

ALJ found that Kastner had satisfied steps 1 and 2; he had not engaged in substantial gainful activity and he had severe impairments in the form of a disorder of the spine and chronic nerve damage to the shoulder. However, at step 3, the ALJ determined that Kastner's conditions did not meet the requirements for presumptive disability.

Kastner challenges the ALJ's adverse determination at step 3.[1] Under a theory of presumptive liability, a claimant is eligible for benefits if he has a condition that meets or equals an impairment found in the Listing of Impairments. 20 C.F.R. §§ 404.1520(d); 404.1525(a); 20 C.F.R. pt. 404, Subpt. P, App. 1. Each listing has a set of criteria which must be met for an impairment to be deemed conclusively disabling. Specifically, Kastner contends that his condition meets or equals the requirements for disorders of the spine found in Listings 1.04(A) and (C). Listing 1.04 defines these impairments as:

> *Disorders of the spine* (e.g., herniated nucleus pulposus . . . spinal stenosis, osteoarthritis, degen-

---

[1] At step 5, the ALJ found that Kastner had residual capacity to perform sedentary work in the national economy. Kastner challenges this determination as well. Because we find the ALJ committed errors at step 3, we do not consider the parties' arguments related to step 5. *See* 20 C.F.R. § 404.1520 ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.").

erative disc disease, . . . ), resulting in compromise of a nerve root . . . or the spinal cord.

[Combined w]ith:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or . . . .

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

The parties do not dispute that Kastner has satisfied the threshold requirement for a disorder of the spine. A range of physicians have repeatedly diagnosed Kastner with spondylosis, spinal stenosis, and degenerative disc disease which compromised nerve roots in his spinal cord. The ALJ also found that Kastner's disorder of the spine constituted a severe impairment. But the ALJ determined that Kastner had not demonstrated § 1.04(A) or (C)'s additional requirements for a finding of presumptive disability.

As to § 1.04(A), the ALJ stated simply that Kastner "did not display limitation of motion of the spine as

anticipated by section 1.04A (Ex. 2F, p. 12-14)." Kastner contends that the ALJ erred by ignoring medical evidence that his range of motion of the spine was limited. As noted above, ALJs need not address every piece of evidence presented at a disability hearing. *Craft*, 539 F.3d at 673. Nevertheless, we have held that "[i]n considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). In this case, we conclude that the ALJ's cursory analysis and disability determination were not supported by substantial evidence in the record.

The ALJ cited one exhibit in concluding that Kastner did not meet the requirements of § 1.04A: Dr. Rupert's initial examination of Kastner in 2005. But this examination did not include any range-of-motion evaluation. The Commissioner says that the ALJ simply made an error and intended to reference the range-of-motion examination performed by Dr. Hall. This may well be true. But the only two pieces of evidence in the record involving range-of-motion tests demonstrated that Kastner *did* have limited range of motion. First, in May 2005, Dr. Butler found substantial limitations to Kastner's range of motion: 5 degrees of flexion and extension in the neck with some greater—but still limited—flexion in the back. Then, in August 2006, Dr. Hall conducted a formal range-of-motion examination and again found that Kastner could only perform 20 degrees of cervical extension versus a normal extension of 60 degrees. Similarly, Kastner was only capable

of 70 degrees of lumbar forward flexion versus a norm of 90 degrees. Kastner had 90 degrees of flexion in the hips versus a norm of 100 degrees. Dr. Hall added the notation "pain" after each of these measurements. Because the only evidence in the record demonstrated significant limitations in Kastner's range of motion, the ALJ's contrary conclusion is peculiar and unexplained. An unarticulated rationale for denying disability benefits generally requires remand.

In response, the Commissioner points to § 1.00(G) of Appendix 1 which provides that "[m]easurements of joint motion are based on the techniques described in the chapter on the extremities, spine, and pelvis in the current edition of the 'Guides to the Evaluation of Permanent Impairment' ["AMA Guides"] published by the American Medical Association." 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.00(G). The edition of the AMA Guides in effect when Kastner was examined stated that a patient's pain could potentially limit mobility and lead to inaccurately low or inconsistent measurement of the patient's actual range of motion. The Commissioner contends that Dr. Hall's "pain" notations indicate that he attributed Kastner's limited range of motion to pain and not to a permanent impairment. This, the Commissioner argues, is what the ALJ meant when she stated that Kastner did not display the limitation of motion "anticipated by section 1.04A."

We are not persuaded by the Commissioner's theory. First, the Commissioner gives a reason for discounting the evidence that the ALJ never relied upon. Whether

by accident or oversight, the ALJ never referenced Dr. Hall's examination in her analysis of § 1.04(A). Even if we assume that she intended to, the ALJ never stated that she rejected the range-of-motion evidence due to Kastner's pain. We have repeatedly held that an ALJ must provide a logical bridge between the evidence in the record and her conclusion. *Craft*, 539 F.3d at 673. Here, the Commissioner argues that by referring to motion limitations "anticipated by section 1.04A," the ALJ meant to cross-reference both § 1.00(G) and a specific section of the AMA Guides. But this is not a logical bridge; it is a soaring inferential leap. Nothing in the ALJ's decision indicates that this relatively obscure cross-reference was the basis for the determination. Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). On appeal, the Commissioner may not generate a novel basis for the ALJ's determination. To permit meaningful review, the ALJ was obligated to explain sufficiently what she meant by "limitation of motion of the spine as anticipated by section 1.04A." *See Steele*, 290 F.3d at 940.

Second, even if the ALJ had discounted Kastner's limited motion due to his pain, that determination would not have been supported by substantial evidence. It is true that Dr. Hall included a "pain" notation next to his measurements for Kastner's cervical, lumbar, and hip flexion. But symptoms of pain are not mutually exclusive with the limitations of motion anticipated by

§ 1.04(A). By its terms, § 1.04(A) requires a claimant to demonstrate "limitation of motion of the spine." It does not require a claimant to prove that the motion limitation occurs without pain. To the contrary, another requirement of § 1.04(A) is "nerve root compression characterized by neuro-anatomic distribution of pain." It would be perverse to require claimants to prove the chronic pain that typically accompanies spinal disorders while simultaneously demonstrating an absence of pain when moving their spine.

The regulations explicitly anticipate that pain symptoms will "be present in combination with the other criteria" for a listed impairment. 20 C.F.R. § 404.1529. The initial section of Appendix 1, § 1.00(B)(2)(d) outlines how the regulations define loss of function under an impairment: "Pain or other symptoms may be an important factor contributing to functional loss. . . . The musculoskeletal listings that include pain or other symptoms among their criteria also include criteria for limitations in functioning as a result of the listed impairment, *including limitations caused by pain*" (emphasis added). There is no indication that a limitation of motion caused by persistent pain would not meet the requirement for a disorder of the spine under § 1.04(A).

The AMA Guides stated that fear of injury and other factors could affect the accuracy and consistency of a range-of-motion test. The Commissioner has also noted that a patient's lack of cooperation may affect measurements. This is true. But there is no indication in Dr. Hall's examination or his accompanying narra-

tive account that Kastner's motion limitations were affected by temporary pain, fear of injury, or a lack of cooperation. So there is no evidentiary support for discounting the evidence on that basis. Dr. Hall signed Kastner's Range of Motion Chart, stating, "I attest to the fact that this individuals [sic] <u>active mechanical range of motion</u> was measured" (emphasis in original). Given that Kastner's condition is characterized by chronic pain, it is unsurprising that Dr. Hall would have noted pain in measuring limitation in motion.

It is also worth noting that impairment listings for disorders of the spine were revised in 2001 with the express purpose of relaxing the limitation-of-motion requirement. The earlier version of the listing had required limitation of motion of the spine to be "significant." *See* Revised Medical Criteria for Determination of Disability, Musculoskeletal System and Related Criteria, 66 Fed. Reg. 58,010 (Nov. 19, 2001). The agency rejected the "significant" criterion as "imprecise" and concluded that "any limitation of motion [would be] significant if it were accompanied by the other requirements of the final listing." *Id.* So, the agency has determined that any restriction on movement that a doctor considers a medical limitation of motion will satisfy this element of the listing. Even if Kastner's pain affected the consistency and accuracy of his range-of-motion examinations, it is difficult to conclude on this record that Kastner failed to demonstrate "any limitation of motion"—the standard the agency adopted when it revised the listing.

Next, the Commissioner contends that Kastner has provided no evidence of "motor loss (atrophy with associated muscle weakness or muscle weakness)," an additional requirement of Listing 1.04(A). This argument fails for the same reasons as before; the ALJ never referenced motor loss as a basis for the determination at step 3. The Commissioner's theory is speculation barred by the *Chenery* doctrine.

And in any event, the record does contain evidence of Kastner's motor loss. The Commissioner points to Kastner's initial examinations in 2005 where Dr. Rupert measured normal muscle strength. But this ignores the 2006 examination where Dr. Hall found reduced strength in Kastner's left arm and stated: "He cannot lift well with his left arm."[2] The Commissioner also references a May 9, 2006 examination with Dr. Chou where Kastner stated that his pain was getting much better since his surgery and he could lift his left arm. But this occurred three months before Dr. Hall's examination during the period when Kastner showed initial signs of improvement after his first surgery. "An ALJ may not selectively consider medical reports . . . but must consider all relevant evidence." *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (internal quotation marks and citations

---

[2] The Commissioner also disregards other evidence including Dr. Chou's January 7, 2005 examination where he noted that Kastner was experiencing "bilateral arm numbness" and the April 19, 2006 visit where Dr. Chou stated that Kastner "is completely weak in his left deltoids . . . and he is numb in the shoulder patch and the deltoids feel a little bit flaccid to me."

omitted). Dr. Hall's August 2006 examination may be better evidence of Kastner's long-term condition.

Furthermore, Kastner's arm strength is not the only evidence of motor loss. Under "Examination of the Spine," § 1.00(E)(1) of Appendix 1 states: "Inability to walk on the heels or toes, to squat, or to arise from a squatting position, when appropriate, may be considered evidence of significant motor loss." In his examination, Dr. Hall observed that Kastner could walk on heels and toes but that he had "difficulty with tandem walking [and] squatting. He gets down but nearly cannot get back up without use of the arms." In the January 4, 2005 examination, Dr. Butler also observed that Kastner had "trouble with standing, stooping and lifting." This evidence supports a finding of motor loss and the ALJ never articulated any contrary conclusion.

Kastner also challenges the ALJ's determination as to Listing 1.04(C). The ALJ concluded that Kastner did not meet or equal the requirements of the listing "because he was able to ambulate effectively, which was generally well enough to perform basic activities of daily living. For example, the claimant testified that he was able to walk around his house, to clean, to bathe, attend basketball games, and perform volunteer work at school . . . ." Under § 1.00(B)(2)(b)(2) of Appendix 1, "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." This level of impairment "is defined generally

as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities" such as a walker, two crutches, or two canes. *Id.* It is not clear from this record that Kastner has demonstrated such "extreme limitation" to his ability to walk, and the ALJ correctly considered evidence of his household activities to determine whether he met the requirement. On remand, however, we would encourage the ALJ to consider and account for the medical evidence along with Kastner's personal statements about his symptoms. *See* 20 C.F.R. § 404.1529(b).

## III.  CONCLUSION

We REVERSE the judgment of the district court and REMAND the case to the Social Security Administration for further proceedings consistent with this opinion.