NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

Argued January 25, 2013
Decided , March 27, 2013

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 12-2602

| | |
|---|---|
| SHARON A. SCHREIBER, | Appeal from the United States |
| *Plaintiff-Appellant,* | District Court for the Northern |
| | District of Illinois, Western Division. |
| v. | |
| CAROLYN W. COLVIN,* Acting | No. 10 C 50167 |
| Commissioner of Social Security, | |
| *Defendant-Appellee.* | P. Michael Mahoney, |
| | *Magistrate Judge.* |

**ORDER**

Sharon Schreiber suffers from several mental impairments and applied for disability insurance benefits under the Social Security Act, 42 U.S.C. § 423(d). After holding an

---

* Pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure, we have substituted Carolyn W. Colvin for Michael J. Astrue as the named defendant-appellee.

evidentiary hearing, an administrative law judge found that Schreiber was not disabled. On appeal, Schreiber challenges the ALJ's evaluation of the opinion of Schreiber's treating psychiatrist, adverse credibility determination, and failure to analyze Schreiber's fatigue and panic attacks in determining her residual functional capacity. Bearing in mind the deferential standard of review that applies, *see* 42 U.S.C. § 405(g), we conclude that substantial evidence supports the ALJ's decision and therefore affirm the denial of benefits.

Schreiber applied for disability insurance benefits on September 7, 2006, contending that psychological problems, including bipolar disorder, anxiety, and depression, rendered her unable to work. Schreiber has been receiving treatment from her psychiatrist, Dr. Mary E. Belford, M.D., since 1995. Prior to December 2005, Schreiber was successfully taking medication for anxiety and depression. She felt well enough to wean herself off of Paxil, start taking St. John's Wort, and open her own business—a combination coffee shop and video store. The stress of opening and running a business proved too much, however, and on December 19, 2005, Schreiber visited Dr. Belford's office and reported that she was "a mess." She said that running the store on her own and problems with her daughter caused her to cry constantly, lose her appetite, sleep poorly, and suffer from mood swings and low self-esteem. The treatment notes from this visit indicate that she was anxious, moderately depressed, tearful, and had impaired judgment and insight. Schreiber was diagnosed with moderate mixed bipolar disorder and prescribed Xanax (used to treat anxiety and panic disorder) and Trileptal (an anti-convulsant and mood-stabilizing drug).

In January 2006, Schreiber reported similar symptoms and continued problems with the store she had opened, which was now closed. She said that her family had many bills because of the store and that she had "made a mess of things." Dr. Belford found that Schreiber still showed impaired judgment and insight and was agitated and anxious, and modified Schreiber's medications, increasing the dosage of Schreiber's Xanax and replacing the Trileptal with Effexor (an anti-depressant). In February, Schreiber improved: she reported that although she still had some residual anxiety and concentration problems, she was feeling better and working through some of the problems with the business, which she had allowed a neighbor to take over. Dr. Belford added Zyprexa (an anti-psychotic medication) to Schreiber's medications.

This improvement was short-lived, however. In April, Schreiber reported to Dr. Belford that she was continuing to have problems with the business and her old symptoms were returning. On April 21, 2006, Schreiber was hospitalized for five days after reporting that she woke up every morning disappointed that she was not dead. She complained of overwhelming anxiety, mood swings, lack of concentration, and weight and sleep loss. Schreiber was diagnosed as having bipolar disorder and panic disorder.

The following month, on May 15, 2006, Schreiber was again seen at the hospital after reporting thoughts of suicide. She complained of her prior symptoms and was diagnosed with major depressive disorder and encouraged to continue with her medications and attend group therapy.

Schreiber continued to see Dr. Belford over the course of the next few months. In June, Schreiber reported that she was miserable and stressed about her family's financial situation: the auction of her business was to be held this month, and her daughter had recently lost her medical insurance and had unpaid bills. Dr. Belford noted that Schreiber complained of anhedonia, anxiety, loss of appetite, excessive crying, and decreased energy levels, and had stopped taking Xanax or Zyprexa. She modified Schreiber's medication, prescribing Geodon (an anti-psychotic medication used to treat bipolar disorder) and Depakote (an anti-seizure medication used to treat bipolar disorder), and advised her to follow up in a month.

In July, Schreiber had recently returned from a camping trip with her husband and reported that many of her symptoms had improved. She was eating and sleeping better, had no depression or anxiety, and denied anhedonia, but she still suffered from crying spells, low energy, and noticed that she was quick to anger. Dr. Belford advised Schreiber to attend counseling; Schreiber had been seeing a therapist, but thought her insurance benefits had run out for the year. After confirming that her benefits had been restored, Schreiber said that she would restart therapy.

At her visit to Dr. Belford in September, Schreiber reported increased anxiety and a loss of appetite, and said she was still stressed by her family's financial situation and her relationship with her daughter. She also said she was still not in therapy despite being referred to the therapist several times, but indicated that "this time she [wa]s really going." Dr. Belford continued Schreiber on Klonopin and Effexor and increased the dosage of her Lamictal (an anti-seizure medication used to treat bipolar disorder). In November, Schreiber reported that she was doing somewhat better, but said she still felt numb and did not want to do anything.

On November 14, 2006, Schreiber attended a psychological examination with Dr. Erwin Baukus, Ph.D., a clinical psychologist, at the request of the state agency in connection with her application for benefits. At the examination, Schreiber complained of symptoms of depression and generalized persistent anxiety. Dr. Baucus inquired into her level of daily functioning and examined her mental status, including her mood and affect, speech, thought process, and mental capacity. Based upon the clinical examination and his review of Schreiber's treatment records, Dr. Baukus diagnosed Schreiber with bipolar disorder, current episode depressed, with anxiety. He opined that she was able to manage funds on her own behalf.

Eight days later, Dr. Russell Taylor, Ph.D., a psychologist, reviewed Dr. Belford's treatment records and the notes from Dr. Baukus' consultative examination on behalf of the state agency. He opined that Schreiber had bipolar disorder with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. Dr. Taylor concluded that this disorder caused mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation of extended duration.[1] Dr. Taylor concluded that Schreiber was capable of understanding, remembering, and carrying out simple tasks on a sustained basis, but would require a work setting with limited social or interpersonal demands. Dr. Taylor also found that Schreiber would be able to adjust to simple changes in the work setting. Dr. Ronald Havens, Ph.D., reviewed and affirmed Dr. Taylor's opinions on February 26, 2007.

On January 10, 2007, Schreiber returned to see Dr. Belford. In her notes, Dr. Belford observed that while many of Schreiber's symptoms had improved, she was "definitely not back to her usual self," and adjusted her medications. In March, Schreiber reported to Dr. Belford that nearly all of her symptoms had improved and that she was finally feeling more like herself. She said she was engaging in counseling and found it to be very helpful. At a follow-up appointment in May, Schreiber said that she was feeling better, and Dr. Belford noted that while Schreiber "still has some roller coaster left," she was generally doing better. Schreiber was trying to make healthy lifestyle choices, was gardening again, and planned to resume counseling after getting off schedule due to vacations.

Dr. Belford filled out a form regarding Schreiber's ability to work in June 2007. Dr. Belford opined that Schreiber's ability to understand, remember, and carry out instructions were affected by her mental impairments, and opined that Schreiber had either "poor" or "fair"

---

[1] Dr. Taylor found that Schreiber was moderately limited in the following areas: the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a constant pace without an unreasonable number and length of rest periods; the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and the ability to set realistic goals or make plans independently of others.

abilities in the 23 functional work activities enumerated on the form.[2] Dr. Belford also opined that Schreiber's impairments affected her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting.[3] She stated that her opinions were based on a "clinical interview," but she provided no details regarding the interview.

In August 2007, Schreiber returned to see Dr. Belford, who noted that Schreiber was much improved from a year prior. Schreiber reported that her anxiety was triggered "once in a while" and that her family's finances were still extremely tight, leading to stress regarding the cost of an upcoming vacation. Dr. Belford noted that Schreiber's emotional foundation was better due to her medication and that her moods were "nowhere near as reactive and out of control" as they were in the past. She told Schreiber to continue with her medications. At her November follow-up visit, Schreiber reported general improvement, but said that she was still on an "emotional roller coaster." She explained that winter was always a more difficult time for her, and that she had difficulty leaving the house and had not followed up on Dr. Belford's counseling recommendation. Schreiber informed Dr. Belford that she was not taking much Xanax and had not refilled her last prescription.

At her last appointment with Dr. Belford in the record, on February 27, 2008, Schreiber reported that she was "doing pretty well": she had increased energy and motivation levels and her anxiety was under control.

At the hearing for her application for benefits in May 2008, Schreiber testified that she was 43 years old, married, and living with her husband and son. She said that she last worked in December 2005 when she tried to open and run the business that she ultimately closed and sold after suffering a breakdown. According to Schreiber, her typical day involves waking her son up around 7:00 a.m., getting him ready, and driving him school. She said that she usually returns home by 8:30 a.m., and sometimes will lie down until around noon if she feels tired.

---

[2] In particular, she opined that Schreiber had a "poor" ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work with others without being disturbed by them; complete a normal workday or workweek; and perform at a persistent pace.

[3] Specifically, she opined that Schreiber had a "poor" ability to accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; set realistic goals or make plans independently of others. Dr. Belford said that Schreiber had a fair ability to perform all other tasks listed.

On her good days, she said she will sit on the couch, visit her mother, or go online to chat with others who share her condition. She said that she gardens about once a week, does a minimal amount of household chores, and sometimes does the grocery shopping. In the afternoon, she tries to help her son with his homework and get the kitchen ready so she or her husband can cook when he returns home. In the evenings, Schreiber said that she spends time with her family and watches television. Schreiber said that she sees friends about once every two weeks and has one friend with whom she talks on the phone every day.

Regarding her impairments, Schreiber testified that she experiences panic, anxiety, and mood swings that make it difficult for her to be around people. She said she has problems with her concentration and ability to maintain focus and believes that she is only capable of being productive for about two hours a day. She said that she averages at least two panic attacks per day, and that each attack can last for a few hours. Schreiber also said that about two or three times per month she has prolonged panic attacks that require a day or two to recover. She said that she takes Xanax when she has the panic attacks, but that it makes her very tired and incapable of doing anything for the remainder of the day.

Schreiber testified that she had been seeing Dr. Belford since 1995, usually for fifteen minutes once every two or three months. She said that she had seen a therapist on-and-off for about six months on a weekly basis, but that she discontinued the therapy because she did not find it helpful. She was also in daily group counseling for a few weeks in 2007. Schreiber testified that she has been on a variety of medications and, at the time of the hearing, was taking Effexor, Lamictal, Geodon, Xanax, and naproxen sodium. She said that the medications have helped her, but that they have not completely cured her bipolar disorder. She also said that the medications have caused side effects including blurred vision, heart palpitations, grogginess, and weight fluctuation.

A vocational expert testified that a person of Schreiber's age, education, and work history, who was limited to simple tasks in a setting with limited social or interpersonal demands and with no more than simple changes in the work setting, could do Schreiber's past relevant work as an assembler or machine operator. If Schreiber were found to be credible regarding her description of her impairments, however, the vocational expert testified that she could not sustain full-time employment because her panic attacks would take her off task for too much of the workday.

The ALJ concluded that Schreiber was not disabled and denied her claim for benefits after applying the familiar five-step evaluation process, *see* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ concluded that Schreiber had not worked since her alleged onset date. At steps two and three, the ALJ concluded that Schreiber suffered from the severe impairments of bipolar

disorder, anxiety, and depression, but that these impairments or a combination of impairments did not meet or equal a listed impairment.

At step four, the ALJ evaluated Schreiber's residual functional capacity, or the measure of the abilities Schreiber retained despite her impairments. 20 C.F.R. § 404.1545(a). The ALJ found that Schreiber had the residual functional capacity to perform work at all exertional levels, but that she must be limited to simple tasks in a setting with limited social or interpersonal demands and no more than simple changes in the work setting.

In determining Schreiber's residual functional capacity, the ALJ found that Schreiber's impairments could produce the symptoms Schreiber alleged, but that her "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment[.]" The ALJ noted that Schreiber suffered from bipolar disorder with depression and anxiety that had been characterized by mood swings, sleep and appetite disturbances, anxiousness, crying spells, feelings of hopelessness, and decreased energy and impaired concentration. Nevertheless, he found that the record established that Schreiber's condition and symptoms, while not resolved, had improved since her hospitalization in 2006. He noted the evidence in the record indicating that Schreiber could perform a wide-variety of activities of daily living and that Schreiber was consistently described as alert and oriented, as well as the lack of evidence supporting her claims of significant side effects from her medication. The ALJ also cited the opinions of Dr. Taylor and Dr. Havens in support of his residual functional capacity determination, but he discounted Dr. Belford's assessment of Schreiber's ability to do work-related activities. The ALJ found Dr. Belford's assessment "unpersuasive" because it was conclusory, inconsistent with other evidence of record, and inadequately described the clinical findings to support the limitations Dr. Belford found.

Based on Schreiber's residual functional capacity, the ALJ found that Schreiber could do her past relevant work and was therefore not disabled; the ALJ did not proceed to step five of the analysis. *See* 20 C.F.R. § 404.1520(a)(4)(iv). When the Appeals Council denied review, the ALJ's decision became the final decision of the Social Security Commissioner, and Schreiber brought an action in the district court seeking judicial review of the Commissioner's final decision. The district court affirmed the Commissioner's decision, and Schreiber appealed.

We review *de novo* the district court's judgment affirming the Commissioner's final decision, *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010), and will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "evidence a reasonable person would accept as adequate to support

the decision." *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006). "When reviewing for substantial evidence, we do not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). A decision denying benefits need not address every piece of evidence, but the ALJ must provide "an accurate and logical bridge" between the evidence and her conclusion that a claimant is not disabled. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

On appeal, Schreiber's challenges to the ALJ's decision focus on his assessment of Schreiber's residual functional capacity at step four. Schreiber's primary argument is that the ALJ improperly rejected the opinions of her treating psychiatrist, Dr. Belford, and failed to discuss adequately his refusal to credit her assessment. Under the "treating physician rule," a treating physician's opinion that is consistent with the record is generally entitled to "controlling weight." 20 C.F.R. § 404.1527(c)(2); *Jelinek*, 662 F.3d at 811. However, an ALJ need not blindly accept a treating physician's opinion: an ALJ "may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007) (internal quotations marks and citation omitted).

Here, we find that the ALJ adequately explained his reasons for discounting Dr. Belford's opinion that Schreiber had a poor ability to perform a number of work-related tasks. The ALJ was particularly troubled by the "conclusory" nature of Dr. Belford's assessment and her failure to describe the clinical findings that supported the significant limitations she found other than a reference to a "clinical interview." Schreiber argues that Dr. Belford did not need to include clinical findings to support her assessment given her long history of treating Schreiber and the many treatment notes indicating that Schreiber suffered from significant bipolar symptoms. But the ALJ recognized that Dr. Belford had been treating Schreiber for a number of years and consulted Dr. Belford's treatment notes to see if they supported her opinions. The ALJ found that the notes, which indicated improvement in Schreiber's condition with medication and counseling, were inconsistent with the significant limitations in Dr. Belford's assessment. He also found her assessment inconsistent with the level of treatment she provided Schreiber—a fifteen-minute visit every two to three months. Additionally, the ALJ noted that Schreiber's own reported activities of daily living and the opinions of Dr. Taylor and Dr. Havens were inconsistent with Dr. Belford's assessment of Schreiber's limitations.

Although Schreiber acknowledges that the treatment notes indicate some improvement in her condition, she argues that the ALJ improperly focused on the positive reports in the

treatment notes and failed to recognize the episodic nature of bipolar disorder. She points out that Dr. Belford's notes discussing improvement in Schreiber's condition were usually qualified by observations indicating that Schreiber was "not back to her usual self" and that she still suffered from significant symptoms. She likens her situation to that of the claimant in *Bauer v. Astrue*, 532 F.3d 606 (7th Cir. 2008). In *Bauer*, the claimant was diagnosed as bipolar and, though prescribed a variety of antipsychotic drugs, was hospitalized several times with hallucinations, racing thoughts, thoughts of suicide, and other symptoms of bipolar disorder. *Id.* at 607. The claimant testified that she had been fired from her job because her condition prevented her from working, and both her treating psychiatrist and treating psychologist opined that she could not hold down a full-time job. *Id.* The ALJ, however, gave these opinions little weight based on reasons that indicated that the ALJ lacked familiarity with bipolar disorder, such as a few hopeful remarks in the claimant's treatment notes, and selective citations to the claimant's testimony regarding her activities of daily living. *Id.* at 608-09. Given the claimant's medical history and the lack of any indication that the treating doctors erred in the analysis supporting their opinions, we found the ALJ's reliance on the hopeful remarks as a basis to discount their opinions problematic, noting that:

> A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job. . . . That is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment.

*Id.* at 609 (internal citations omitted). The ALJ overlooked this aspect of the claimant's bipolar disorder in *Bauer*, and so we remanded the case.

Schreiber contends that we should take the same course here. We disagree. Although we continue to emphasize the necessity of taking into account the episodic nature of many chronic conditions, *Bauer* is distinguishable from this case. Here, the ALJ did more than rely on "hopeful remarks" in Schreiber's treatment notes to paint an overly-rosy view of her condition. The ALJ recognized that Schreiber suffered an "episode of decompensation"—or a temporary increase in symptoms "accompanied by a loss of adaptive functioning," *see Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010) (defining "episode of decompensation")—beginning in December 2005 and culminating in her hospitalization in April 2006. But he concluded that the evidence of record indicated that Schreiber had experienced improvement with treatment since that period. This is not to say that he found that Schreiber was "all better"; rather, he recognized that Schreiber still struggled with her bipolar disorder and that it caused

limitations on her ability to work and relate to others. Nevertheless, after considering all of the medical evidence, including treatment notes from Dr. Belford, the assessment by Dr. Baukus, and the reports from Dr. Taylor and Dr. Havens, as well as Schreiber's own testimony regarding the improvement in her condition, the ALJ found that Schreiber's symptoms had improved over time, and we conclude that this finding was supported by substantial evidence.

Schreiber also argues that the ALJ failed to properly analyze Dr. Belford's opinion because he did not specifically address each factor set forth in 20 C.F.R. § 404.1527. When an ALJ chooses to reject a treating physician's opinion, she must provide a sound explanation for the rejection. *See* 20 C.F.R. § 404.1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Here, while the ALJ did not explicitly weigh each factor in discussing Dr. Belford's opinion, his decision makes clear that he was aware of and considered many of the factors, including Dr. Belford's treatment relationship with Schreiber, the consistency of her opinion with the record as a whole, and the supportability of her opinion. *See* 20 C.F.R. § 404.1527(c). While we may not agree with the weight the ALJ ultimately gave Dr. Belford's opinions, our inquiry is limited to whether the ALJ sufficiently accounted for the factors in 20 C.F.R. § 404.1527, *see Elder v. Astrue*, 529 F.3d 408, 425-26 (7th Cir. 2008) (affirming denial of benefits where ALJ discussed only two of the relevant factors laid out in 20 C.F.R. § 404.1527), and built an "accurate and logical bridge" between the evidence and his conclusion. We find that deferential standard met here.

Schreiber also argues that the ALJ erred in analyzing Dr. Belford's opinions because he misstated the record in reaching his conclusion that the "record contains no treatment notes since January of 2007 that would establish any significant worsening of [Schreiber's] condition." Specifically, the ALJ noted that the most recent treatment note in the record was from January 2007, when, in fact, the last treatment note was from February 2008. Schreiber also raised this argument before the district court, and we agree with the district court that any error in the ALJ's failure to address the treatment notes from Schreiber's appointments with Dr. Belford during the rest of 2007 and February 2008 was harmless. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error analysis to claim for disability benefits). As our discussion above indicates, those notes demonstrate continued improvement in Schreiber's condition and symptoms aside from some stress about how to pay for a vacation and emotional anxiety caused by the onset of winter. Thus, this is unlike the cases Schreiber cites in which the ALJ ignored evidence that contradicted his ultimate conclusion, *see Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003), or "pick[ed] and cho[se] among the pieces of evidence," *see Binion v. Chater*, 108 F.3d 780, 788-89 (7th Cir. 1997). Accordingly, while we are concerned that the ALJ failed to discuss over a year's worth of treatment notes, we will

not remand the case on this ground because the notes supported the ALJ's finding that the "record contains no treatment notes since January of 2007 that would establish any significant worsening of [Schreiber's] condition."

Schreiber also challenges the ALJ's credibility assessment. An ALJ's credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted). When reviewing an ALJ's credibility determination, we are limited to examining whether the ALJ's determination was "reasoned and supported," *Elder*, 529 F.3d at 413-14 (citations omitted), and will overturn the determination only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (citation omitted). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong and deserving of reversal." *Elder*, 529 F.3d at 413-14 (internal quotation marks and citations omitted). Nevertheless, the ALJ is still required to "build an accurate and logical bridge between the evidence and the result[.]" *Castile*, 617 F.3d at 929 (internal quotation marks and citation omitted). "In analyzing an ALJ's opinion for such fatal gaps or contradictions, we give the opinion a commonsensical reading rather than nitpicking at it." *Id.*

In determining the credibility of a claimant, SSR 96-7p instructs the ALJ to "consider the entire case record" and requires a credibility determination to "contain specific reasons for the finding on credibility, supported by the evidence in the case record[.]" SSR 96-7p, 1996 WL 374186 at *4. An ALJ should consider elements such as "objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and aggravating factors, functional limitations, and treatment (including medication)." *Prochaska*, 454 F.3d at 738 (citations omitted). Here, the ALJ considered these factors and found that Schreiber's testimony regarding her symptoms and their functional effect were not fully credible. He pointed out that Schreiber's claims of significant side effects from her medication were inconsistent with the medical record (most of the treatment notes indicated no medication side effects at all); Schreiber herself testified to the improvement in her symptoms with treatment; and the evidence, including Schreiber's testimony and Dr. Baukus' examination report, indicated that Schreiber took care of her activities of daily living and cared for her children, shopped, and did household chores.

Schreiber argues that the ALJ erred in his credibility determination because he failed to acknowledge the qualifications Schreiber made regarding her activities of daily living and did not take the episodic nature of bipolar disorder into account. Specifically, Schreiber points us to her testimony and evidence that indicates that she sometimes disregarded the household chores around her home, that her husband plays a large role in the completion

of household tasks, and that she has good days and bad days. We agree that the ALJ's discussion regarding Schreiber's activities of daily living was not ideal in this regard. We have repeatedly emphasized that an ALJ is supposed to consider a claimant's limitations in performing household activities, *e.g., Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (citation omitted), and cautioned "that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time," *e.g., Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (citations omitted). Nevertheless, although the ALJ's adverse credibility finding was not perfect, it was also not "patently wrong." The ALJ did not place undue weight on Schreiber's activities of daily living, *cf. Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006), and he specified several valid reasons for finding Schreiber not credible, including the discrepancy between her complaints of significant side effects from her medication in her hearing testimony and the lack of evidence regarding those symptoms in the treatment notes from her visits to Dr. Belford. Additionally, he noted that Schreiber's complaints regarding the effects of her symptoms were inconsistent with the evaluations of examining psychologist Dr. Baukus and reviewing psychologists Dr. Taylor and Dr. Havens, as well as with the level of treatment she received. We therefore conclude that although the ALJ's discussion of Schreiber's activities of daily living was not ideal, the ALJ provided a sufficient basis for his adverse credibility determination.

Schreiber also contends that the ALJ erred by using boilerplate language in his credibility determination that we have repeatedly criticized: that Schreiber's "statements concerning the intensity, persistence and limiting effects of the symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." We have found this statement problematic because it puts "the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion." *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)). But the use of such language is not fatal if the ALJ "has otherwise explained his conclusion adequately." *Id.* Here, as discussed above, the ALJ did offer reasons grounded in the evidence, and we conclude that the ALJ satisfied his minimal duty to articulate his reasons and make a bridge between the evidence and his credibility determination.

Schreiber's final argument regarding the ALJ's decision is that the ALJ failed to analyze her claims of fatigue and frequent panic attacks and their effect on her ability to perform work-related activities. Contrary to Schreiber's assertions, however, the ALJ clearly took her allegations of fatigue into account in determining her residual functional capacity. The ALJ noted that the medical evidence indicated that Schreiber had suffered from sleep

disturbances and decreased energy as a result of her mental impairments. But he also noted that Schreiber denied fatigue to Dr. Belford in January 2007, and that subsequent treatment notes showed no significant worsening of her condition.[4] The ALJ also mentioned Schreiber's hearing testimony that taking Xanax made her tired and groggy, but he found that those complaints were inconsistent with her denial of side effects from her medication in Dr. Belford's treatment notes from May and November 2006. Ultimately, the ALJ concluded that Schreiber's fatigue-related symptoms caused limitations on her ability to function, although not to the extent that Schreiber alleged at her hearing. But, as we discussed above, the ALJ did not find Schreiber's testimony regarding the extent of her symptoms wholly credible, a determination we have not found to be "patently wrong."

We reach the same result as to the ALJ's analysis of Schreiber's claims of frequent panic attacks. While the ALJ's analysis was perfunctory, any error was harmless. First, it is clear from the ALJ's decision that he did not find Schreiber's allegations of frequent and severe panic attacks fully credible, a finding that is well-supported by evidence inconsistent with Schreiber's claims. For example, while Schreiber testified that she took Xanax to treat her twice-daily panic attacks at the hearing, she had told Dr. Belford two months prior that she "very rarely" used Xanax anymore. Additionally, Schreiber points us to only one medical record containing a specific reference to panic attacks, a hospital record from May 2006 in which she reported that she had felt "anxiety, nervous panic attacks." Given this lack of evidence regarding panic attacks in the record, Schreiber cites to evidence that indicates she suffered from panic disorder and anxiety generally. But the ALJ considered Schreiber's panic disorder and anxiety and their related symptoms through his review and discussion of Dr. Belford's treatment notes and the assessments of the consulting psychologists. He concluded that these impairments were severe and, accordingly, restricted Schreiber to several mental limitations in the residual functional capacity determination. Schreiber's argument that the ALJ failed to analyze her panic attacks is therefore unavailing.

To be sure, as we have indicated, the ALJ's decision was not perfect. But it was supported by substantial evidence, and we must nevertheless affirm the denial of benefits even if

---

[4] This includes the February 2008 treatment note that Schreiber contends shows that her fatigue was left "untreated." Although the note indicates that Schreiber had stopped taking Provigil (which was intended to address energy and motivation issues) because it made her irritable, the note also indicates that she denied fatigue and reported that she was sleeping better and had more energy and motivation.

"reasonable minds could differ concerning whether [Schreiber] is disabled." *Elder*, 529 F.3d at 413 (internal quotation marks and citations omitted).

**AFFIRMED**.